In re PARKVIEW HOSPITAL, Debtor.

John J. HUNTER, Trustee, Plaintiff,

v.

ST. VINCENT MEDICAL CENTER, et al., Defendants.

Bankruptcy No. 94–32051.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

Jan. 31, 1997.

David Wicklund, Toledo, OH, for St. Vincent Medical Center.

Monica Moloney, Columbus, OH, for Ohio Atty. Gen.

Mary Ann Whipple, Toledo, OH, for Mid American National Bank.

## MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court upon Motion for Summary Judgment of Defendant Betty D. Montgomery, Attorney General for the State of Ohio, and the Responses filed by John J. Hunter, Trustee and Mid–American National Bank and Trust Company. This Court has reviewed the arguments of counsel, exhibits, as well as the entire record in the case. Based upon that review, and for the following reasons, the Court finds that the Attorney General's Motion should be granted.

## FACTS

The Debtor in this case, Parkview Hospital, was a non-profit osteopathic hospital located in Toledo, Ohio, which closed shortly before it filed bankruptcy. At issue in this case is a fund (hereafter "the Fund") established in the name of Parkview Hospital via an account at Mid–American Bank and Trust Co. (hereafter "Mid–American"). The account is titled "Parkview Development Fund -Restricted" on Mid–American's account statements. Mid–American is also the largest unsecured creditor in the related bankruptcy case and a Defendant in this adversary proceeding. The Plaintiff, John J.

Hunter, is the Chapter 11 Trustee who has been appointed in this case.

First funded in 1971, the Fund was initially called the Research Activity Fund. It was referenced in the Parkview Code of Regulations, which also provided for the appointment of a Research Activity Fund Committee. It was the Committee's duty to administer and memorialize the legacies and donations to the Fund. In 1980, the Fund's name was subsequently changed to the Development Fund, and the name of the Research Activity Fund Committee was accordingly changed to the Development Fund Committee. Because no records of periodic reconciliations with bank statements exist, either because they were lost or were never prepared in the first instance, it is not now possible to tie into the balance of the account at Mid–American with the records of the donated funds. What is available are records kept in spiral notebooks which memorialize, in individual handwritten entries, donations to the Fund from hundreds if not thousands of donors. According to this Court's addition, the sum of the individual entries in the notebooks total One Hundred Seventy-eight Thousand Eight Hundred Fifty-six and 53/100 Dollars ($178,856.53). These entries begin in December of 1974 and continue monthly through December of 1993. Most donations were less than one hundred dollars and are noted to be "in memory of" what appear to be deceased persons. Other entries include donations of a thousand dollars or more, though only one exceeds five thousand dollars.[1]

As of the commencement of this case, the Fund totaled Two Hundred Fifty-two Thousand Two Hundred Eight and 34/100 Dollars ($252,208.34). Though this is more than the donations of One Hundred Seventy-eight Thousand Eight Hundred Fifty-six and

53/100 Dollars ($178,856.53) recorded in the notebooks, this discrepancy is explained at least in part by the fact that the notebooks date back only to December of 1974, whereas the Fund was established in 1971.[2] Also, the entries end December of 1993, though the bankruptcy case was not filed until August of 1994.

Under statutory authority, the Attorney General for the State of Ohio (hereafter the "Attorney General") has taken the position that the Fund is made up of donations of a charitable character that impose a restriction on the Fund's use. Accordingly, the Attorney General alleges that the Fund is a charitable trust, and is therefore not property of the bankruptcy estate. The Chapter 11 Trustee and Mid–American disagree. They argue primarily that there is not sufficient evidence to show a charitable trust. As the available evidence is documentary, a Motion for Summary Judgment is the most appropriate method for resolving this dispute.

In support of her Motion, the Attorney General submitted the following exhibits: the Parkview Code of Regulations revised March, 1981 and January, 1984; various Minutes of the Special Meetings of the Research Activity Fund; various Minutes of the Organizational, Reorganizational and Annual Meetings of the Board of Trustees of Parkview Hospital; various Minutes of the Organizational Meetings of the Research Activity Fund Committee; various Minutes of the Organizational, Reorganizational, and Annual Meetings of the Development Fund Committee; various Minutes of the Annual Meetings of the Corporation, various Minutes of the Regular Meetings of the Board of Trustees of Parkview Hospital; various Minutes of the Research Activity Fund Committee Meetings; various Minutes of the Development Fund Committee Meetings; various Minutes

---

1. This was the donation of Six Thousand Dollars ($6,000.00) from a physician in December of 1989.

2. The January 6, 1974 minutes of the annual meeting of the Corporation of Parkview Hospital report the principal amount in the Fund as being Forty-six Thousand Seven Hundred Eighty-six and 93/100 Dollars ($46,786.93) on that date. This added to the sum of the records in the notebooks brings the total to Two Hundred Twenty-five Thousand Six Hundred Forty-three and 46/100 Dollars ($225,643.46). This total still does not include any contributions made from January through November of 1974, or those after December of 1993.

The individual contributions through December 31, 1972 can be found in the January 7, 1973, minutes of the Parkview Board of Trustees. These total Thirty-three Thousand Four Hundred Seventy-four and 27/100 Dollars ($33,474.27).

of the Executive Committee of the Board of Trustees; various Minutes of the Staff Development Committee Meeting; Inter Office correspondence dated June 7, 1972, to Dr. Naduad; Inter Office correspondence dated June 7, 1972 to Dr. Carlson; Memorandum dated June 19, 1972, to B.A. Zeiher; Parkview Hospital Research Activity Fund Financial Report dated June 30, 1972 and Balance Sheet dated December 31, 1977; Administrator's Annual Report dated January 30, 1973; Minutes of Special Joint Meeting of Research Activity Fund Committee and the Staff Development Committee dated July 16, 1974; letter dated January 24, 1977, to B.A. Zeiher from Harry Feldman; Minutes of the Special Committee of the Board of Trustees to study the Research Activity Fund dated March 7, 1980; Memorandum dated October 29, 1982 regarding "An Evening of Jazz with Marian McPartland;" various Minutes of the Development Fund Solicitation Committee; and the Corporate Authorization Resolution.

Separately, the Attorney General has also submitted a transcript of the deposition of Bernhardt A. Zeiher who was president of Parkview Hospital for thirty-seven years (having retired in 1991). Both the Trustee and Mid–American were represented at the deposition and engaged in cross examination. Further, the Attorney General has also submitted two brochures which discuss charitable giving to the hospital. One is entitled "When You Ask 'How Can I Help?' " and contains what this Court believes to be an accurate summarization of the Research Activity Fund as reflected in the available record of the Fund, with a couple of exceptions discussed infra. This brochure reads in pertinent part:

Parkview Hospital has never engaged in active solicitation of funds from the general public, the community it serves. The hospital has received numerous gifts over the years and they have been utilized in the manner prescribed by the donors.

By no means consider this packet a solicitation by Parkview Hospital. It is merely presented as a suggestion for those interested in the development of the hospital and the osteopathic concept of medicine and surgery.

Gifts to the hospital may be stipulated or unstipulated. They may, for example, be designated for the Building Fund or the Research Activity Fund, which are described individually herein. Or they may be designated as a general contribution to the hospital for use as its Trustees see fit. Contributions also may be in the form of memorials for deceased loved ones or friends.

Contributions may be made in several ways. These include gifts from taxable income, stocks and securities, capital gifts in installments; and gifts from will and life insurance. All are tax deductible.

\* \* \* \* \* \*

Your gifts to Parkview Hospital, whether specified to the Building Fund, Research Activity Fund or to the hospital at large, have lasting value to all concerned.

\* \* \* \* \* \*

A contribution to the Research Activity Fund helps in the education and recruitment of future physicians. There is—and will continue to be—a growing need for osteopathic physicians in the Toledo area. Competition for qualified young doctors is great throughout the country. The Research Activity Fund helps Parkview to be competitive in recruiting its professional talent. Contributions to this fund also are used for research projects which benefit both the hospital and the concept of osteopathic medicine and surgery.

\* \* \* \* \* \*

The Research Activity Fund was established in 1971 to provide a special source of revenue from projects involving scientific research and staff development activities of the Parkview Hospital. A committee of the hospital's trustees and medical and administrative staffs administers the fund. *Only the earnings, or interest, accumulated by the fund are used to finance the projects. The base amount in the fund is thus allowed to grow over the years, offering greater potential as time goes on.*

Among the early achievements of the fund has been the financial assistance of osteopathic college students from the Toledo area. The students are given a loan

from the fund, payable upon their graduation from medical school and completion of internship. The loans are offered as incentives to the students to return to the Toledo area and to Parkview Hospital when they are ready to begin their practices.

Other aspects of the fund cover the financing of research projects which serve to both enhance both Parkview Hospital and the osteopathic concept of medicine and surgery.

*To assist in the development of this vital, new undertaking, the Parkview Trustees have directed that all unstipulated gifts to Parkview Hospital be placed in the Research Activity Fund.*

Contributions to the Research Activity Fund are tax-deductible. Those contributing $500.00 or more will have their names permanently inscribed on a wall plaque displayed in the hospital lobby.

When stipulating your donation for this purpose, please designate: Contributions for Research Activity Fund. (Emphasis added.)

Such brochures existed as early as 1973, when they were mentioned in Parkview Hospital Corporation meeting minutes. This summary is accurate except in two details. First, it is not clear what if any research projects were ever undertaken. The evidence shows that the Fund's income was used for loans to medical students and starting physicians, but bears no mention of any research project. Second, though the brochure says that no solicitations were made of the general public, such a statement turns on a clever use of the term "solicitation." Indeed, the brochure itself could be seen as a means of solicitation. Further, even if a more restricted definition of the term is used, Parkview clearly solicited funds from the general public in later attempts to raise money for the Fund. Finally, the creation of the Fund itself was a means to encourage charitable giving.

It is important for the purpose of this Opinion to note two other characteristics of the Fund, italicized in the quote above. First, the Fund was restricted, only the interest could be used to fulfill its purpose.

Second, Parkview designated that all donations which were not restricted by the donors would be placed into the restricted Fund.

The second brochure is titled "A Choice in Medical Care—The Parkview Hospital Development Fund." This brochure emphasizes the importance of having the choice to choose osteopathic medical care in the northwest Ohio and southeast Michigan area, and that the purpose of the Development Fund is to help educate osteopathic physicians and to help osteopathic physicians set up practices in the area. It points out the differences of osteopathic medical care, such as the fact that osteopathic physicians tend to be family care practitioners rather than specialists. The brochure documents a loan made to a medical student and a starting physician, and how these loans enabled them to respectively enter the osteopathic field, and start an osteopathic practice in Genoa, Ohio. It concludes:

The student loan package is interest-free throughout his or her training and the physician loan package is interest-free during the physician's first year in practice in the Parkview Hospital service area. Both types of loans are repayable within five years. No student or doctor has defaulted on a loan in the history of the fund.

Along with the brochures, the Attorney General also submitted a postage paid envelope addressed to Parkview Hospital, attention Development Fund. The back of the envelope reads:

### A Choice in Medical Care

We hope you will agree that a choice in medical care is important, even if you have not personally made the choice of osteopathic care. The Parkview Hospital Development Fund is helping meet the need for family care physicians for people in this area. It cannot continue to do so without your help. The Fund must continue to attract osteopathic physicians by providing loans for education and by helping osteopathic physicians set up their practices. Please give generously so the greater Toledo area may continue to be a viable choice for today's osteopathic physician.

Other exhibits include those submitted by Mid–American. Mid–American has been ac-

tively involved in the Fund's programs since as early as 1976. The exhibits are bank statements for the Fund for the period of December 6, 1988, to September 9, 1994, as well as deposit slips and canceled checks for transactions occurring on June 4, 1991, and August 29, 1991, and records of account transfers occurring on February 1, 1989, and January 18, 1991.

This Court has thoroughly reviewed all of the exhibits. This Court finds the minutes of the meetings of Parkview Hospital Board of Trustees, the Development Fund Committee, f.k.a. Research Activity Fund Committee, and other various meetings provide the most detailed history of the Fund over the years. The following facts are primarily highlights from the minutes of the various meetings, and are supported by the deposition of Mr. Zeiher and the other exhibits in the case.

On May 26, 1971, the minutes of the Research Activity Fund Committee show that the Research Activity Fund contained a balance of Twenty-five Thousand Six Hundred Forty-one and 14/100 Dollars ($25,641.14). This amount had been "invested" into the Parkview Building Fund at an interest rate of six percent (6%). According to Mr. Zeiher, the Fund was formed as the result of the bequeath from an individual, but it is unclear if the formation of the Fund was a requirement of the bequeath or was simply conceived by the Parkview Hospital Board of Trustees as a way of putting the donation to good use.

The May 15, 1972, the Research Activity Fund Committee Minutes show that the loan was repaid to the Fund with interest, bringing the balance to Twenty-seven Thousand One Hundred Forty-three and 12/100 Dollars ($27,143.12). At this time, a letter was read from a medical student requesting financial assistance to attend an osteopathic medical school. This caused a discussion of whether or not to use the interest earned on the Fund for educational purposes. It was agreed to do so, and the Parkview Staff Development Committee was designated to screen the applicant. There was no discussion of using the principal for this or any other purpose.

By the July 26, 1972, meeting of the Parkview Hospital Board of Trustees, two medical students were each granted One Thousand Dollar ($1,000.00) loans. It was reported that the Staff Development Committee was interested in developing a packet of information for individuals interested in making donations to the Hospital Building Fund or the Research Activity Fund. At the same time, the Staff Development Committee planned active recruitment programs aimed at attracting osteopathic medical students, interns, and practitioners. It was felt that the growth of the osteopathic profession and the hospital was contingent upon the growth of osteopathic practitioners.

The September 26, 1972, minutes of the Parkview Hospital Board of Trustees reflect that the Executive Staff Committee moved that chart delinquency fees (a fee apparently charged to the doctors when they did not complete their charts on time) be funneled into the Research Activity Fund in the future. The motion was approved by the Board. It also showed that plaques were recommended for contributors of Five Hundred Dollars ($500.001) or more to the Fund. (Mr. Zeiher explained that Parkview had two plaques located at the hospital which memorialized these donations.) Finally, it showed that the Board directed an undesignated bequest of Five Thousand Dollars ($5,000.00) into the Fund.

The minutes of the Parkview Hospital Corporation meeting on January 7, 1973, stressed the necessity of recruiting additional osteopathic physicians to the area to increase bed occupancy. Also discussed was the Research Activity Fund, and the importance of brochures titled "How Can I Help," (quoted supra). On May 29, 1973, the minutes of a meeting of the Board of Trustees reflected the importance that the Fund continue to grow since only the earnings of the Fund can be used, and that if they wished to help greater numbers of students, more funds would be essential. Also in 1973, the minutes of the Research Activity Fund Committee and the Parkview Hospital Board of Trustees show a balance of Thirty-six Thousand Eight Hundred Seventy-three and 98/100 Dollars ($36,873.98). More loans were made to students in 1973, and the Staff Development Committee sought donations from

the medical staff to increase the principal of the Fund. It was also recommended that the Parkview Board consider making donations to the Fund available at mortuary facilities in lieu of flowers.

In 1974, the Research Activity Fund Committee considered and approved having the hospital guarantee loans to students by banks. The interest earned on the principal in the Research Activity Fund could then be used to defray the interest on the loans to students. Thus, without invading the principal of the Fund, more loans could be made available to students. A restriction was also put on these loans, that loan recipients must serve an internship and period of practice or residency with the hospital. It was also noted that there was heavy activity in the Fund as the result of contributions in lieu of flowers.

On January 5, 1975, a meeting of the Research Activity Fund Committee was held, and it was reported that negotiations previously authorized by the Board were undertaken to borrow Fifteen Thousand dollars ($15,000.00). It was also reported that legal counsel had been consulted who indicated that the Research Activity Fund was within its legal rights to borrow said funds to the extent that the earnings from the principal funds on deposit were adequate to meet the interest payments on any borrowed funds. In view of the Fund having these monies available, the Committee directed the Fund to repay Eleven Thousand Two Hundred Eighty and 95/100 Dollars ($11,280.95) due to the hospital, including six percent annum interest (6%), this being the rate the hospital paid on interest on funds borrowed from the Fund several years before.

A December 15, 1975, balance sheet of the Fund showed total assets of Eighty-three Thousand One Hundred Twenty-three and 81/100 Dollars ($83,123.81), of which the principal balance was Fifty-six Thousand Nine Hundred Ninety-one and 95/100 Dollars ($56,991.95). Of the principal, approximately Thirty-nine Thousand Two Hundred Nine and 39/100 Dollars ($39,209.39) was unrestricted donations designated to go into the Fund by the hospital, and Seventeen Thousand Seven Hundred Eighty-two and 56/100 Dollars ($17,782.56) was restricted by donors. In a December 30, 1975, Executive Committee meeting of the Board of Trustees, Mid-American Bank expressed definite interest in managing all student loan funds, and in January of 1976, it took over these accounts. In 1976, a Five Thousand Dollar ($5,000.00) ninety day loan was made to a physician to help him establish a practice in Rossford, Ohio.

By December 31, 1977, the balance sheet showed a principal balance in the Fund had grown to Seventy Thousand Nine Hundred Ninety-three and 02/100 Dollars ($70,993.02), of which Forty-five Thousand Seven Hundred Twelve and 89/100 Dollars ($45,712.89) was designated by the hospital and Twenty-five Thousand Two Hundred Eighty and 13/100 Dollars ($25,280.13) was restricted by the donors. In 1977, the Parkview Code of Regulations was also amended so that the One Thousand Dollar ($1,000.00) donations made by new members of the hospital would be designated to go into the Fund.

In 1980, the principal balance had reached approximately Eighty Thousand Dollars ($80,000.00). It was noted in the March 7, 1980, minutes of the Special Committee to Study the Research Activity Fund how only the interest earned on the principal of the Research Activity Fund could be used to further the Fund's goals. It was discussed that a strong drive for donations to the Fund was necessary because the principal balance was not large enough to generate the income necessary to pay the interest on the student loans, now approximately Thirty Thousand Dollars ($30,000.00) per year. These loans were made by Mid-American. It was recommended that a fund raising drive be undertaken, that the approval of the Chamber of Commerce be obtained, and that the goal would be to reach the Three Hundred Thousand Dollar ($300,000.00) mark. To this end, brochures were prepared, though it is not clear to whom they were mailed. By the May 27, 1980, meeting of the Board of Trustees approval of the Chamber of Commerce had been obtained, and the solicitation of donations was further discussed, including the generation of a list of patients from the staff members so that letters can be written

to patients signed by the doctor. It was noted that the loans were necessary for the hospital to remain competitive with other hospitals. By the December 30, 1980, meeting of the Board of Trustees, it was reported that literature (brochures) was at the printers, and that patient names had been submitted and letters will be ready for mailing in early January, as scheduled.

In 1982, fund raising efforts for the Fund continued. A jazz concert was put on by the hospital, with the expenses of the event (Nine Thousand Four Hundred and Four Dollars ($9,404.00)) being paid by the Hospital, and the income (Thirteen Thousand Two Hundred Twenty-six Dollars ($13,226.00)) being donated to the Fund. Other concerts were put on in 1983. By 1983 the balance of the Fund increased to One Hundred Fifty-seven Thousand Three Hundred Three and 95/100 Dollars ($157,303.95). However, because the interest due on the student loans had exceeded the interest generated by the Fund, the hospital had loaned the fund Forty-five Thousand Dollars ($45,000) so that the principal would not be invaded. By January of 1984, the deficit had increased to Sixty-five Thousand Dollars ($65,000.00). However, in January of 1985, it was reported that no contributions were necessary to keep the Fund solvent that year.

A fund-raising concert was also put on in 1985, but it resulted in a loss. By January of 1986, it appears that enthusiasm had waned in the Fund, and there was mention of attempting to revitalize the efforts through methods such as seeking donations from large corporations. It was also noted in the January 30, 1986, minutes of the Development Fund Solicitation Committee that the Fund was established to enhance the osteopathic profession and the hospital, and later developed into a program to underwrite loans for osteopathic physicians and medical students. At this time the balance in the Fund reached approximately One Hundred Ninety-five Thousand Dollars ($195,000.00). In September of 1986, the Parkview Board of Trustees approved the promotion of a program for the Fund whereby areas of the hospital would be designated for dedication, with established dollar values for each area, and four or five levels of value.

In February of 1990, it was noted that two programs were offered by the Development Fund, the Physicians Assistance Loan Program, and the Student Loan Program, and that all loans were handled by Mid–American. It also noted that a fund-raiser was again going to be planned to be held during National Osteopathic Week (when these had been held before), but the Committee decided not to have a concert that year and instead immediate efforts were to be concentrated on updating the Development Fund brochure with new pictures and a contribution form on the back. Having a dinner for Development Fund donors was also discussed, with Jamie Farr as the featured speaker. Also in February of 1990, it was noted that the Fund had an excellent record, with only one loan having gone bad. In March of 1990 it was noted that the wives of physicians were very enthusiastic about working with the Development Fund Committee. In June of 1990, it was discussed that an osteopathic convention was to be held in Toledo, proceeds from which will go to the Student Loan Fund at Ohio University College of Osteopathic Medicine and the Parkview Hospital Development Fund.

Between 1991 and 1994, when Parkview ceased operations and filed bankruptcy, it appears that the management at Parkview became unconcerned with memorializing the activities of the Fund. Nevertheless, it is apparent that the drive for contributions continued, bringing the balance to Two Hundred Fifty-two Thousand Two Hundred Eight and 34/100 Dollars ($252,208.34) as of the commencement of this case.

From the entire record of the Fund, this Court makes the following findings. Though it is without question that Parkview should have kept more detailed accounting records and memorializations of the activities of the Fund (or that these records should not have been lost), this Court nevertheless finds that the following conclusions are supported by the record taken as a whole, and that little in the record is inconsistent with these factual findings. This Court finds that the Fund was a restricted fund, whose interest income

was to be used for the purpose of promoting osteopathic medicine in the Toledo area. The principal was to perpetually remain untouched. This Court also finds that the Fund was treated as such through the twenty-five years of its existence, though loans were made from the hospital to the Fund as needed, so that the Fund could make good on its obligations without invading its principal. Though this Court sees no significant evidence of any misuse of the Fund, this Court finds even if such misuse did exist, it was inconsistent with the purpose and restrictions of the Fund as it was held out to donors.

This Court also finds the following sources of the monies in the Fund, in descending order of the portion of the total dollars: unrestricted charitable donations to the hospital designated by the hospital to go into the Fund when at the same time the Fund was made available for donations as a restricted fund whose interest income was to be used for the purpose of promoting osteopathic medicine in the Toledo area as detailed above; fees and gifts from Parkview board members and staff either designated to go into the Fund by the hospital, or made directly to the Fund, when at the same time the Fund was made available for donations as detailed above; donations received from patients of the hospital and donations contributed to the hospital in lieu of flowers from patients' friends and family, when at the same time the Fund was made available for donations as detailed above; and donations solicited from the members of the general public when at the same time the Fund was made available for donations as detailed above.

## LAW

The Bankruptcy Code, 11 U.S.C. § 101 et seq., provides in pertinent part:

**11 U.S.C. § 541. Property of the Estate**

(a) The commencement of a case.. creates an estate. Such an estate is comprised of all the following property, wherever located and by whomever held:

(1) ... [A]ll legal or equitable interests of the debtor in property as of the commencement of the case.

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The Bankruptcy Rules provide in pertinent part:

**Rule 7056. Summary Judgment**

Rule 56 F.R.Civ.P. applies in adversary proceedings.

The Federal Rules of Civil Procedure provide in pertinent part:

**Rule 56. Summary Judgment**

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Ohio Revised Code provides in pertinent part:

**109.23 Definition of a charitable trust; application**

As used in sections 109.23 to 109.33 of the Revised Code:

(A) "Charitable trust" means any fiduciary relationship with respect to property arising under the law of this state or of another jurisdiction as a result of a manifestation of intention to create it, and subjecting the person by whom the property is held to fiduciary duties to deal with the property within this state for any charitable, religious, or educational purpose.

(D) The fact that any person sought to be charged with fiduciary duties is a corporation, association, foundation, or any other

type of organization that has, under judicial decision or other statutes, been distinguished from a charitable trust does not provide a presumption against its being a charitable trust as defined in this section.

**1702.12 Authority of [Nonprofit] Corporation**

(D) Subject to the limitations prescribed by law or in its articles, a [nonprofit] corporation may make donations for the public welfare, for religious, charitable, scientific, literary, or educational purposes, or in furtherance of any of its purposes.

**1702.35 [Nonprofit] Corporate property**

All property acquired by a [nonprofit] corporation by purchase, gift, devise, bequest, or otherwise shall be the absolute property of the corporation, unless at the time of acquiring such property it is otherwise in writing specified.

## DISCUSSION

This case is presented to the Court upon the Attorney General's Motion for Summary Judgment. A movant will prevail on a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In order to prevail, the movant must demonstrate all elements of the cause of action. *R.E. Cruise, Inc. v. Bruggeman*, 508 F.2d 415, 416 (6th Cir.1975). Thereafter, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). See also *In re Bell*, 181 B.R. 311 (Bankr.N.D.Ohio 1995),

In the case at bar, the Attorney General asserts that the documentary evidence which is available in this case shows that the Fund was established, presented to the contributors, and received donations as a fund whose use would be restricted in accordance with its charitable purposes. Accordingly, the Attorney General alleges that Parkview Hospital held only legal title as a trustee of a charitable trust established to aid in the furtherance of osteopathic medicine in the northwest Ohio and southeast Michigan area. If so, the Fund would be excluded from the bankruptcy estate, as indicated in § 541(d) of the Bankruptcy Code. *In re Bishop College*, 151 B.R. 394 (Bankr.N.D.Tex.1993).

If the Attorney General can successfully demonstrate this cause of action, the burden then shifts to the Trustee and Mid–American to show that a genuine issue of material fact exists for trial. To understand whether the Attorney General has made such a showing, a review of the law of charitable trusts is necessary.

The Supreme Court of Ohio has stated that the definition of charitable trusts found in Ohio Revised Code § 109.23(A) is similar to the one found in Restatement (Second) of Trusts § 348, and is the generally accepted definition for an express trust. *Brown v. Concerned Citizens for Sickle Cell Anemia*, 56 Ohio St.2d 85, 90, 382 N.E.2d 1155, 1158 (1978). This section of the Restatement provides:

> **§ 348. Definition of Charitable Trust**
>
> A charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose.

The Comment (f) following this section of the Restatement is helpful for an understanding of the common law of charitable trusts and their relationship with non-profit corporations:

> f. *Charitable corporations.* Property may be devoted to charitable purposes not only by transferring it to individual trustees to hold it for such purposes, but also by transferring it to a charitable corporation. It may be provided that the corporation shall take property for any of the

purposes for which the corporation is organized. It may be provided that the corporation shall take the property for only one of its purposes. It may be provided that the corporation shall hold the property forever and devote the income only to the accomplishment of the purposes of the corporation for one of its purposes. Thus, where a gift of property is made to an incorporated educational institution, it may be given with a direction to invest the principal and use the income in paying the salary of a professor of mathematics.

Where property is given to a charitable corporation, particularly where restrictions are imposed by the donor, it is sometimes said by the courts that a charitable trust is created and the corporation is a trustee. It is sometimes said, however, that a charitable trust is not created. This is a mere matter of terminology. The important question is whether and to what extent the principles and rules applicable to charitable trusts are applicable to charitable corporations.

Ordinarily the principles and rules applicable to charitable trusts are applicable to charitable corporations. Where property is given to a charitable corporation without restrictions as to the disposition of the property, the corporation is under a duty, enforceable at the suit of the Attorney General, not to divert the property to other purposes but to apply it to one or more of the charitable purposes for which it is organized. Where property is given to a charitable corporation and it is directed by the terms of the gift to devote the property to a particular one of its purposes, it is under a duty, enforceable at the suit of the Attorney General, to devote the property to that purpose. Where property is given to a charitable corporation and it is provided by the terms of the gift that it shall retain the principal and devote the income only to the accomplishment of its purpose or one of its purposes, the corporation is under a duty, enforceable at the suit of the Attorney General, to retain the principal and to use the income for the designated purposes.

The doctrine of cy pres (see § 399) is applicable to gifts to charitable corporations as well as to gifts to individual trustees for charitable purposes.

Restatement (Second) of Trusts § 348 cmt. f.

■ Thus, a common law doctrine has evolved whereby property can be donated to a charitable corporation in trust, and the charitable corporation can be restricted to use only the income for designated charitable purposes. It has also evolved at common law (codified in Ohio in Ohio Revised Code § 109.23–109.33) that the Attorney General is the proper party to assert the validity of a charitable trust imposed upon a charitable corporation. The issue in this case is whether the Attorney General has shown the requisite manifestation of intent of the donors to the Parkview Research Activity Fund, later renamed the Development Fund, to create such a trust.[3]

Regarding this intent, the Supreme Court of Ohio has also explained:

In determining whether an instrument has created a private trust, the question is whether the settlor not only expressed a desire that the recipient of the property use it in a certain way but whether he

---

3. This Court finds that all other requirements for a charitable trust clearly exist. Regarding charitable purpose, a similar case was addressed by the Ohio Court of Appeals in *Folino v. Dayton Bar Association*, 1982 WL 3822 (Ohio App.). In *Folino*, the Court found that a charitable purpose existed where a trust was created to benefit attorneys in need by making small loans to young lawyers to held them establish their practices, or during "financially embarrassing periods of their practice." *Id.* at 3. The Court explained, "Poverty and education are needs recognized by the public in many forms and agencies, but there are other forms of need and benefit, not so provided for, which equally fall within the ambit of public charitable purposes. One of these, early recognized in England and in this country, is aid or assistance to young tradesmen and craftsmen, and loans at low rates to young persons desirous of entering upon a trade or profession. The need to help those who have been educated, to extend the benefit of their education to the public, is as important as their education." *Id.* at 4. In the present case, the aid to young osteopathic doctors and those desirous of establishing a practice in the Toledo area so that the benefit of these doctors' osteopathic education may be extended to the people in this area is also clearly a charitable purpose.

expressed an intention to impose a duty upon the recipient to so use it (i.e. whether the language used was not precatory in character but mandatory). 1 Restatement of the Law, Trusts (2d), 69, Section 25; 1 Scott, Law of Trusts (2 Ed., 1956), 193 Section 25.2. The question is the same in determining whether a charitable trust has been created. 2 Restatement of the Law, Trusts (2d), 215, Section 351, Comment (a); 4 Scott, supra, 2574, Section 351. See e.g., *Lanham v. Howell* (1951), 210 Miss. 383, 49 So.2d 701. The question is also the same where the recipient of the property is a charitable corporation. 4 Scott, supra, 2558, Section 348.1. See, e.g., *Zabel v. Stewart* (1941), 153 Kan. 272, 109 P.2d 177. *Ohio Society for Crippled Children and Adults, Inc. v. McElroy,* 175 Ohio St. 49, 51, 191 N.E.2d 543, 545 (1963).

Again, the Restatement and the comments following, cited by the Ohio Supreme Court supra, are insightful in this case:

### § 351. Intention to Create a Trust

A charitable trust is created only if the settlor properly manifests an intention to create a charitable trust.

Comment:

a. The rule stated in this Section is the same as the rule which is applicable to private trusts. See § 23.

b. *Mode of manifestation of intention.* No particular form of words or conduct is necessary for the manifestation of intention to create a charitable trust. Compare, as to private trusts, § 24(2). A charitable trust may be created although the settlor does not use the word "trust" or "trustee."

c. *Precatory words.* A charitable trust is not created unless the settlor manifests an intention to impose enforceable duties. Compare to private trusts § 25. Thus, if the settlor merely expresses a suggestion or wish that the transferee should apply the property to charitable purposes, leaving it to the transferee to follow the suggestion or comply with the wish only if he desires to do so, a charitable trust is not created and the transferee holds the property for his own benefit. A charitable trust is not created if the settlor manifests an intention to impose merely a moral obligation. On the other hand, the mere fact that the settlor uses language which is precatory rather than mandatory does not necessarily indicate an intention not to create a charitable trust.

Restatement (Second) of Trusts § 351.

■ The Trustee and Mid–American assert that the standard of proof to show the requisite manifestation of intent to create a charitable trust is the clear and convincing evidence standard, citing *In re Hoffman's Estate,* 175 Ohio St. 363, 195 N.E.2d 106 (1963); *In re Mock v. Bowen,* 1992 WL 163959 (Ohio App.); *In re Phillips,* 41 B.R. 143 (Bankr.N.D.Ohio 1984); *In re B.I. Financial Services Group, Inc.,* 854 F.2d 351 (9th Cir.1988). However, these cases concern private trusts rather than charitable trusts. Most cases dealing with charitable trusts do not mention a standard of proof at all. Nevertheless, this Court will apply the clear and convincing evidence standard to the case at bar.

Regarding charitable trusts, it is clear that courts have "exemplified their sympathy with charities and desire to support them wherever possible." *Rice v. Stanley,* 42 Ohio St.2d 209, 220–221, 327 N.E.2d 774, 782 (1975), quoting 3 Bogert, The Law of Trusts and Trustees (2 Ed.) 747, Section 344. See also *Ohio Society for Crippled Children and Adults, Inc.,* 175 Ohio St. at 52–53, 191 N.E.2d at 546 (noting the interest of the public in encouraging the creation and the continuation of trusts for charitable or public purposes); *Danner v. Shanafelt,* 159 Ohio St. 5, 10–11, 110 N.E.2d 772, 775 (1953) (noting the line of Ohio Supreme Court cases upholding charitable trusts even where the proposed provisions are arguably vague, inexpedient, or impractical); *City of Springfield v. Patterson,* 26 Ohio Misc. 242, 251, 270 N.E.2d 683, 688 (1970) (holding that charitable trusts are entitled to a liberal and favorable consideration and will receive a more liberal construction than is allowable to private trusts in cases of gifts to individuals); *Fenn College v. Nance,* 4 Ohio Misc. 183, 189, 210 N.E.2d 418, 422 (1965) (holding that charitable trusts are entitled to a liberal and favorable consideration and will receive a more liberal con-

struction than is allowable to private trusts in cases of gifts to individuals); *Brown v. First Presbyterian Church of Mt. Gilead,* 1981 WL 6458 (Ohio App.) (holding rule against restraints on alienation of real property does not apply to charitable trusts); *Bell v. Straight, Inc.,* 707 F.Supp. 325 (S.D.Ohio 1989) ("In a case involving a purported charitable trust, the Court must use liberal and broad rules of construction[,] the law of equity favors a charitable trust."); *Gearhart v. Richardson,* 109 Ohio St. 418, 432–434, 142 N.E. 890, 894–895 (1924) ("The general doctrine is that charitable trusts have been favored, and trusts created for such purposes are carried into effect by courts of equity upon general principles of equity jurisprudence under circumstances where private trusts would fail.")

The case at bar differs from the usual charitable trust case in that the purported trust property was not donated by one settlor at one time, but rather is the accumulation of numerous donations over a period nearing twenty-five years. However, there are a number of cases in Ohio where a charitable trust has been found upon solicited donations for a charitable purpose. In *Brown v. Concerned Citizens for Sickle Cell Anemia,* 56 Ohio St.2d 85, 382 N.E.2d 1155 (1978), mentioned supra, the Court found that the profit generated from bingo games purportedly for the benefit of an organization whose purpose was to aid and assist residents of target areas of the City of Dayton, Ohio, in educating, testing and treating sickle cell anemia was impressed with a charitable trust. In *Amer. Diabetes Assoc., Inc. v. Diabetes Society of Clinton County,* 31 Ohio App.3d 136, 509 N.E.2d 84 (1986), the Court found a charitable trust for the benefit of a local non-profit in the hands of a regional non-profit for donations received to further the charitable purpose locally. *Fenn College v. Nance,* 4 Ohio Misc. 183, 210 N.E.2d 418 (1965), dealt with "restricted" donations made to a local college held in trust for educational purposes. In *Brown v. Jackson,*

1986 WL 1054 (Ohio App.), the Court found that bingo game profits were held in trust for charitable purposes. In *Bell,* 707 F.Supp. at 327–28, the Court denied a movant's motion for summary judgment because it was not clear from the facts as to whether donors to fund drug rehabilitation program expressed an intention to impose a duty that their donations be used in a certain charitable manner, and therefore · a charitable trust could exist. In *Brown v. Holloway,* 1981 WL 2853 (Ohio App.), discussed in more detail infra, the Court found that trial court erred by dismissing at trial the Attorney General's action to show that tickets sold for the benefit of a fireman's fund created a charitable trust.

■ Of the cases cited above, some courts (*Concerned Citizens for Sickle Cell Anemia and American Diabetes*) based their holdings on the doctrine of constructive (charitable) trusts rather than express (charitable) trusts. These courts did not reach the issue of whether an express trust was created, and chose instead to apply the doctrine of constructive trust. This is undoubtedly due to the broader application of equity in constructive trusts, thereby avoiding the more delicate issue of the requisite manifestation of charitable intent. Due to a recent bankruptcy case from the Sixth Circuit, *In re Omegas Group, Inc.,* 16 F.3d 1443 (6th Cir.1994), the doctrine of constructive trust does not appear available in this case.

In *Omegas,* the Court held that a constructive trust cannot be imposed upon the property of a bankruptcy estate once bankruptcy is filed. 16 F.3d at ˙1453. The Court explained that a bankruptcy estate consists of the assets of the debtor as of the commencement of the bankruptcy case. *Id.* at 1449. Further, the Court held that a constructive trust does not exist until a plaintiff obtains a judicial decision finding the plaintiff to be entitled to a judgment impressing defendant's property with a constructive trust. *Id.* at 1451.[4] Also, the Court explained that

---

**4.** The concurrence in *Omegas* made a point which is noteworthy. It pointed out that under § 541, the state law should determine when a constructive trust comes into being. 16 F.3d at 1454. The concurrence then applied the appropriate state's law, that of Kentucky, and found that a constructive trust arises upon a judicial determination of the same. *Id.* at 1555. In the present case the Attorney General cites *Bender v. Cleveland Trust Co.,* 123 Ohio St. 588, 176 N.E.

a constructive trust is merely a means by which a court can say that the defendant must relinquish property that the defendant holds as a result of unjust enrichment. *Id.* 1449. However, the Bankruptcy Code provides its own remedies for creditors who have been defrauded by debtors. *Id.* at 1451. Thus, a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code. *Id.* The Court concluded, "To permit a creditor, no matter how badly he was 'had' by the debtor, to lop off a piece of the estate under a constructive trust theory is to permit that creditor to circumvent completely the Code's equitable system of distribution." *Id.* at 1453.[5]

Thus, in the case at bar, it would appear that the doctrine of constructive trust is not available as a means of finding a charitable trust in this case. However, when prior to bankruptcy a debtor served as trustee of an express trust, the debtor generally has no rights to the assets kept in trust, and a trustee in bankruptcy "must fork them over to the beneficiary." *Id.* at 1449. 11 U.S.C. § 541(d). Accordingly, this Court must determine whether an express charitable trust exists in this case. However, as mentioned supra, the Ohio Supreme Court has stated that the common law definition of a charitable trust found in Restatement (Second) of Trusts § 348, and codified in § 109.23(A), is the generally accepted definition of an *express* trust. *Concerned Citizens for Sickle Cell Anemia,* 56 Ohio St.2d at 90, 382 N.E.2d at 1158.

"To constitute an express trust, there must be either explicit language to that effect or circumstances which show with reasonable certainty that a trust was intended to be created." *In re Estate of Hoffman,* 175 Ohio St. 363, 366, 195 N.E.2d 106, 109 (1963),

quoting *Jones v. Luplow,* 13 Ohio App. 428, 431 (1920). The Supreme Court of Ohio's analysis of a will in *Ohio Society,* mentioned supra, is helpful in this case in determining whether an express charitable trust exists. *Ohio Society for Crippled Children and Adults, Inc. v. McElroy,* 175 Ohio St. 49, 191 N.E.2d 543 (1963). In *Ohio Society,* the Court was construing the language of a will which stated that the bequest of a farm was "for use as a home for crippled children." *Id.* at 50, 191 N.E.2d at 544. The will also provided that "This farm is not to be sold or leased but shall be used, operated and farmed by the said [charity]." *Id.* The issue was whether the language of the will constituted a gift as a mere suggestion that the transferee should devote the property to charitable purposes, or whether there was an intention to impose an enforceable duty. (Restatement (Second) of Trusts § 351 cmt. c, cited supra.) This situation is analogous to the case at bar, where the issue is whether the donations made to the Parkview Fund were merely gifts to the hospital with hopes that the money would be used appropriately, or were made with the intent to bind Parkview to use them for the solicited purpose. The *Ohio Society* Court held:

> The words 'for use as a home for crippled children,' standing alone, would probably b[e] considered as merely precatory and as not imposing any enforceable obligation. However, the following words prohibiting sale or lease are clearly mandatory, state what the testator intended should not be done with the farm, add strength to the immediately preceding words and thus tend to indicate his intention as to what should be done with the farm. This analysis leads to the conclusion that the testator intended to impose a legal duty upon the [charity] (1) to use the farm as a home for

452 (1931), for the proposition that under Ohio law a constructive trust attaches at the time that the deeds or misdeeds arose. Thus, under the rationale of the concurrence, a charitable trust could exist in this case. Giving the facts of the present case, this Court would have little difficulty finding a constructive charitable trust.

5. This Court is not certain that the Court's rationale behind the holding in of the *Omegas* applies in this case. Much of the focus of the Court's analysis concerned the fact that the doctrine of

constructive trust is remedial in nature, as for unjust enrichment. This Court is not certain that such a rationale is appropriate regarding constructive charitable trusts, as neither the donors nor the beneficiaries are in a position to file claims and participate in the bankruptcy as do other creditors. Nevertheless, this Court believes it is bound to follow controlling precedent and so will not apply the constructive trust doctrine in this case.

crippled children and (2) not to sell or lease this farm but to operate it.

*Id.* at 52, 191 N.E.2d at 545.

Though there is no will or other written instrument to be construed in the case at bar as there was in *Ohio Society*, the analogy nevertheless provides guidance. When a non-profit organization seeks donations for a charitable purpose, an understanding can be found between the donors and the non-profit corporation that the donations are to be used for the charitable purpose. The issue is whether such an understanding manifests an intent to legally bind the non-profit corporation to so use the funds, or was simply a hopeful desire or suggestion for the ultimate use. Were the donations simply solicited for a charitable purpose, this Court would probably conclude that the intention was precatory and not mandatory. That is, a charitable trust would not exist. However, when the fund is held out as being "restricted," and that only the income generated from the principal could be used for this purpose, this shows that the intent was mandatory. Thus, as in *Ohio Society*, where the restriction on the sale or lease of the property showed that the otherwise precatory language contained a mandatory obligation, the use of a "restricted fund" as a means for receiving charitable donations leans toward the imposition of an intent to legally bind the non-profit corporation to use the donations only for solicited purpose.

*Brown v. Holloway*, 1981 WL 2853 (Ohio App.), also illustrates this point. In that case, the trial court had dismissed the claim of the Attorney General after the conclusion of its case-in-chief. The trial court found that a Fire and Rescue Squad had permitted solicitors to use its name in producing a Christmas variety show. *Id.* at 4. In selling the tickets, solicitors advised the solicitees that the show was being produced to raise money for the firemen's procurement of new equipment. *Id.* Though only twenty percent of the ticket price would go to the charity, the solicitors did not tell this to the solicitees, and the trial court found that many of the solicitees would not have purchased the tickets had they known. *Id.* The trial court had concluded that no express trust of the ticket

sales existed because the Attorney General had failed to show a solicitee manifestation of an intention to create a fiduciary relationship. *Id.* at 4–5. The Court of Appeals reversed, noting that, "the manifestation of intention to create a trust may be by written or spoken words or by conduct. No particular form of words or conduct is necessary for the manifestation of intention to create a trust." *Id.* at 6 (citing Restatement (Second) of Trusts § 24, Restatement (Second) of Trusts § 351 cmt. b, applied to charitable trusts.) Thus, the Court held that the trial court's conclusion (that an express charitable trust with respect to the net proceeds of ticket sales did not exist) was against the manifest weight of the evidence and was contrary to law. *Id.*

Thus, as a matter of law, this Court would have little difficulty finding that an express charitable trust exists where, as here, donations were received for a fund at a non-profit corporation which was held out as restricted for a charitable purpose, and whose principal cannot be invaded. What makes the case at hand more difficult is that the source of much of the funds appears to have come from unrestricted donations made to the non-profit corporation itself which were designated by the hospital to go into the restricted Fund, and from the gifts and donations of the staff and board of the hospital. Further, due to the lack of documentation of accounting records reconciling the Fund's donations with the bank statements, it is now impossible to separate the amount of unrestricted donations designated to go into the Fund by the hospital from the donations restricted by other donors. Also, Parkview paid the expenses of certain fund raising events from which all of the revenues, not just the profit, went into the restricted fund. However, this portion appears to be a small portion of the total.

First, it should be noted that under Ohio law a non-profit corporation can "make donations for the public welfare, for religious, charitable, scientific, literary, or educational purposes, or in furtherance of any of its purposes." Ohio Rev.Code § 1702.12(D). Further, it has been said that, "Where property is given to a charitable corporation with-

out restrictions as to the disposition of the property, the corporation is under a duty, enforceable at the suit of the Attorney General, not to divert the property to other purposes but to apply it to one or more of the charitable purposes for which it is organized." Restatement (Second) of Trusts § 348 cmt. f (quoted supra). Thus, Parkview was not outside its statutory authority to designate that unrestricted donations would go into the Fund. Indeed, doing so appears to be an appropriate means of insuring that the donations were used in accordance with the wishes of the donors, even though the duty to do so may not have been legally enforceable. Parkview did nothing improper by making these designations.

Next, a review of the law regarding trustees contributing to their trusts must be examined. This Court finds an Ohio Supreme Court case concerning an alleged private trust illustrative of the law to be applied in the case at bar. The Supreme Court of Ohio has had an opportunity to address the issue of a settlor establishing himself as the trustee of a trust with no formal trust document in *In re Hoffman's Estate,* 175 Ohio St. 363, 195 N.E.2d 106 (1963), cited supra. Though *Hoffman's* is not squarely on point because the purported trust in question was a private trust rather than a charitable trust, and the only evidence asserted was a designation made on passbooks for savings accounts, it is nevertheless helpful for an understanding of Ohio's view of settlors designating themselves as trustees with no formal trust document. In *Hoffman's,* the Court noted that there are two conflicting rules regarding such savings-book trusts; the New York or "Totten" trust rule, which allows for a "tentative" trust until the depositor dies and upon his death a presumption arises that an absolute trust was created, and the "Massachusetts rule," which the Court quoted as follows:

> It is so common for an owner of personalty to put the apparent title in his own name as trustee for another who furnishes no consideration, without any intent to create a genuine present interest in that oth-

er, or to surrender any part of his own dominion over the property, that the law is skeptical of the reality of the trust so declared. The mere statement that one is trustee for another does not define the nature and extent of the trust, nor show that if a trust is really contemplated it is lawful in purpose. Often the real intent is testamentary. Unless there is a something more than the words that one is trustee for another, to show that a present creation of an equitable interest is intended, and that the settlor had ceased to have full dominion, the nominal cestui has no rights.

*Id.* at 365, 195 N.E.2d at 108. The Court then appeared to follow the Massachusetts rule, holding, "Without a formal trust instrument, the intention and the terms of the trust must be implied. Under the Massachusetts rule ... there must be something more than the words that one is trustee for another to show that the settlor had the present intention to create a trust." *Id.* at 367, 195 N.E.2d at 109.

The Court also held that the "something more" must be shown by clear and convincing evidence. *Id.* This is apparently because "the law is skeptical of such savings bank trusts" because title is equivocal, and the real intent is often testamentary, or a tax exemption, or insurance coverage, or to conceal from others the settlor's pecuniary condition. *Id.* (As noted previously, these concerns do not appear to apply in the present context, where the alleged trust at issue is a charitable trust, and the alleged settlor was a nonprofit institution.)

From *Hoffman's* it becomes apparent that even in the context of a private trust, and even under the more restrictive Massachusetts rule, it is not patently unacceptable that a settlor of a trust could also be the trustee.[6] Further, this is true even if there is no formal trust document, as long as there is a "something more" than the mere words that one is trustee for another, to show that the creation of trust was intended and that the

---

**6.** See also *Mock v. Bowen,* 1992 WL 163959, 5–6 (Ohio App. 6 Dist.), for a further discussion of the law regarding settlors of private trusts denoting themselves as trustees.

settlor had ceased to have full dominion.[7] Further still, in the context of a charitable trust, many of the concerns that cause the Court's skepticism of such trusts do not apply.

In the case at bar, the "something more" clearly exists. Though a substantial portion of the funds in the alleged trust account came from unrestricted charitable donations made to the hospital which were in turn designated to go into the restricted account by the hospital, the account was nevertheless made available for donations for approximately twenty-five years as being a restricted account whereby only the interest on the principal donated would be used for osteopathic purposes. This was to encourage donations to the Fund. In this scenario, this Court does not find the fact that Parkview placed its own funds, or funds donated to it, into this account is a controlling factor as to whether the account was a charitable trust. Parkview consistently made the account available for donations as a restricted fund for the purpose of furthering osteopathic medicine.[8]

In sum, this Court finds ample proof that Parkview and the other contributors consistently manifested the requisite intent that the Fund would be used for a particular charitable purpose and in a manner consistent with a charitable trust. The record, taken as a whole, supports this conclusion. The minutes of the various meetings show a prolonged attempt to raise charitable donations by holding the fund out as a restricted charitable fund whose principal would not be invaded, and whose purpose would be to further osteopathic medicine in the Toledo area. The brochures and the deposition testimony of the former president of the hospital for thirty-seven years also support this conclusion. Further, the notebooks which recorded the numerous contributions over twenty-five years, most of which were less than one hundred dollars, and only one of which were more than five thousand dollars, show that the donations came from numerous donors to whom the Fund was made available as a means of expressing. sympathy and grief upon the loss of a loved one in a manner which was more permanent than flowers. Indeed, it was the permanency of the Fund which made it such an attractive alternative.

Further, the donations which were not restricted by their terms were given to the hospital for the hospital to put to charitable uses at their discretion. Though these could be considered mere gifts which did not by themselves create a fiduciary duty on the part of the hospital, they do, as the common law suggests, express "a suggestion or wish that the transferee should apply the property to charitable purposes, leaving it to the transferee to follow the suggestion or comply with the wish only if he desires to do so." Restatement (Second) of Trusts § 351. Further, it has also been held that, "Where property is given to a charitable corporation without restrictions as to the disposition of the property, the corporation is under a duty, enforceable at the suit of the Attorney General, not to divert the property to other purposes but to apply it to one or more of the charitable purposes for which it is organized." Restatement (Second) of Trusts § 348, cmt. f (cited supra). Considering this, it certainly was not improper for the hospital to take unrestricted donations and place them into a fund which is restricted for charitable purposes commensurate with the wishes of the donors. Indeed, Ohio law expressly provides that non-profit corporations may make charitable donations. Ohio Rev. Code § 1702.12(D).

Nor was it improper for the hospital to direct that certain fees charged to members

---

7. Indeed, the *Hoffman's* Court held that, "To constitute an express trust there must be either explicit language to that effect *or circumstances which show with reasonable certainty that a trust was intended to be created.*" 175 Ohio St. at 366, 195 N.E.2d at 109, citing *Jones v. Luplow,* 13 Ohio App. 428, 431 (1920).

8. It should also be noted that it has not been shown or even alleged that the establishment of the Fund was for the purpose of defrauding creditors. The account was established twenty-five years ago, and there is no indication in any of the numerous documents made available to this Court which would show even a minute likelihood of such an intent. Further, it is unlikely such a scheme could pecuniarily benefit any possible perpetrator.

and employees be put into a restricted charitable fund that would further the mission of the non-profit hospital. These fees were paramount to donations. If this Court had any indication that the hospital was putting money from operations into the Fund in an attempt prevent creditors from reaching them, the outcome would differ. This is not the case. However poor the hospital's record keeping and documentation may have been, this Court does not find an element of dishonesty.

Accordingly, this Court finds that the Attorney General has shown by clear and convincing evidence that the fund at issue in this case is a charitable trust. Clear and convincing evidence is that measure or degree of proof, "which will produce in the mind of the trier of facts a firm belief or conviction as. to the facts sought to be established." *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 180–181, 512 N.E.2d 979, 984 (1987) quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). See also *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613, 620 (1985). From a thorough review of the record this Court has little doubt of the factual findings detailed above, and in particular that: (1) the purpose of the Fund was to further osteopathic medicine in the Toledo area, (2) the use of the Fund was intended to be restricted for that purpose, (3) the principal was intended to never be invaded so that only the income generated by the principal could be used to further the Fund's purpose. Applying these facts to the law detailed above, this Court finds that the Attorney General has met her initial burden on summary judgment of coming forward and showing an absence of any genuine issue of material fact for trial by making the requisite showing that a charitable trust exists. The burden now shifts to the Trustee and Mid–American to show that a material fact exists for trial.

■ The Trustee and Mid–American point to several factors to show that the Fund was not a charitable trust. First, the Trustee and Mid–American point to the fact that there was a commingling of funds between the Fund and the hospital. The record shows, however, that the Fund was maintained as distinct from other hospital accounts. As this Court noted in its factual findings, the hospital would loan money to the Fund when the Fund did not generate enough income to pay the interest it was obligated to pay on the loans the Fund supported. However, this was done so that the principal would not be invaded, because it was consistently held out that such principal would never be spent. Thus, loans were made by the hospital to the Fund, and the financial records kept of the Fund would show that it owed the hospital for the loan. The Fund would transfer repayment to the hospital when it had the available income.

Except for a short-term loan made by the Fund to the hospital with what appears to be monies from its very first contribution in 1971, the record shows no loans made to the hospital by the Fund. Further, even this initial loan was considered an investment and was returned with interest. Also, it was after this initial loan, or "investment in the Parkview Hospital Building Fund," that the purpose became established so as to lead to the Fund being made available for donations as a fund restricted to a charitable purpose for approximately twenty-five years.[9]

9. In his brief, the Trustee directs the Court's attention to certain transactions shown on Mid-American's account statements, including a deposit of Thirty-nine Thousand Nine Hundred Thirty-one and 08/100 Dollars ($39,931.08) on December 16, 1988, a deposit of One Hundred Fifty-one Thousand Four Hundred Sixty-three and 94/100 Dollars ($151,463.94) on March 27, 1989, checks written on the account in the amounts of Fifty Thousand Dollars ($50,000.00) and One Hundred Thousand Dollars ($100,-000.00) on January 18, 1989, and February 1, 1989 respectively, a deposit of Forty-two Thousand Nine Hundred Ninety-five and 44/100 Dollars ($42,995.44) on June 4, 1991 and a deposit of Sixty-nine Thousand Three Hundred Fifty-nine and 53/100 Dollars ($69,359.53) on August 29, 1991. The Trustee also directs the Court's attention to entries which speak of payments on commercial loans on various dates. The Trustee further states, "The nature of these transactions will be clarified by Mid–Am in its response." Mid–American did not address these transactions in its response. Further, this Court does not find such activity in the account as inconsistent with its findings herein. The record shows loans were made between the Fund and the hospital. Further, the record reveals that payments were made on loans to physicians as well as students,

■ Finally, even were some improper use of funds to be shown, this Court would be reluctant to abrogate the intent of the donors (who understood that this Fund was restricted for a charitable purpose) due only to the improprieties of the Fund's trustee. Were Parkview still in existence and not in bankruptcy, and were the Attorney General seeking to impose a charitable trust on the Fund in order to deny the hospital the use of the monies in the Fund in a manner inconsistent with the Fund's restrictions, this Court believes that an Ohio court would have little difficulty imposing the charitable trust against the hospital. This Court does not believe the result should differ in this case.[10]

■ The Trustee and Mid–American also point to the fact that loans were not only made to students, but also to physicians relocating to the area, as proof that a charitable trust did not exist. They argue that this shows the inconsistency of the Fund's purpose. This would indeed be inconsistent if the Fund's sole purpose was to provide educational loans. This Court does not find, however, the purpose was so narrow. It can be seen throughout the entire record of activities surrounding the Fund that the purpose was to further osteopathic medicine in the Toledo area (northwest Ohio and southeast Michigan). Though this was frequently accomplished by making educational loans to students, it was also accomplished by making loans to physicians establishing practices in the area. The loans to physicians were to those who were just starting a practice, and provided a means and incentive to start their practice in the Toledo area. This Court does not find this activity inconsistent. And again, even were the Fund mismanaged at times, this Court would be reluctant to abrogate the imposition of a charitable trust due only to the trustee's mismanagement.

■ The Trustee and Mid–American also argue that the purpose of the Fund was not charitable, and that the Fund was only established to further the hospital's own existence. Further, they point to the fact that some of the loans were made with the conditions that the students do a portion of their internship at the hospital, or practice in the area for a period of time. Though these accusations may be true, this Court does not find any contradiction between these purposes. It is not uncommon for a non-profit corporation to be a trustee of a charitable trust, and by the non-profit's by-laws the purpose of the trust and the purpose of the corporation's existence must be closely related. Indeed, if these purposes were not intertwined there would be a question as to whether the corporation was acting ultra vires. By its very nature the mission of a non-profit is charitable as compared to the profit motive of other corporations. The fact that the purpose of the trust in this case furthers the existence and mission of the trustee-hospital does not defeat the charitable intent of the hospital in initiating and contributing to a charitable trust. This is to be expected. Further, it certainly does not defeat the charitable intent of the other donors to the trust.

■ Similarly, the Trustee argues that there was no separation of legal and beneficial title. This Court finds that there was. The purpose of the trust was to further osteopathic medicine in the northwest Ohio and southeast Michigan area. Thus, the beneficiaries are the people in this area. Though the furthering of such a goal would benefit the hospital, the purpose is nevertheless broader than just benefiting the hospital itself. Also, an underlying assumption in the Trustee's argument is that the increase in osteopathic medicine in the area would inure

and these loans could be considered commercial loans.

10. This Court also finds that the Attorney General has sufficiently traced the trust property. See 5 Collier on Bankruptcy § 541.11, pg. 511–51 (15th ed. revised Dec. 1996). Though periodic bank reconciliations were not undertaken, or were lost, the documents detailing the contributions to the Fund sufficiently show that the Fund received donations which could roughly correspond to the balance in the account. This, combined with the minutes of the various meetings and the fact that the Fund was kept in a distinct account separate from the hospital's other accounts, leads this Court to conclude that the monies in the Fund correspond to the monies impressed with a charitable trust as shown above. This showing is also sufficient to show a charitable trust under Ohio law. See *Brown v. Jackson*, 1986 WL 1054 (Ohio App.).

to the financial success of the hospital. Were Parkview a for-profit hospital, this argument would have weight. But Parkview's mission was not profit. This Court is not prepared to say that a non-profit corporation cannot be a trustee of a trust whose purpose is similar to that of the corporation's mission. Again, this similarity is expected.

 Finally, Mid–American cites to § 1702.35 of the Ohio Revised Code for the proposition that a charitable trust cannot be imposed on the property of a non-profit corporation. Section 1702.35 provides that, "All property acquired by a [non-profit] corporation by purchase, gift, devise, bequest, or otherwise shall be the absolute property of the corporation, unless at the time of acquiring such property it is otherwise in writing specified." This Court has found only one case which has interpreted this provision, *Volunteers of America v. Paul*, 31 Ohio N.P. 317 (1933). In that case, the judgment creditor had caused a levy to be issued upon the property of a non-profit corporation. The non-profit corporation then instituted the action seeking that the lien be released because, it claimed, it held only legal title to the property in trust for the people of Ohio. *Id.* at 318. The creditors, in much the same position as the Trustee and unsecured creditors in the case at bar, countered by citing the provision of Ohio General Code at that time which is almost identical to present § 1702.35 for the proposition that because there was no written trust instrument, the property was the absolute property of the non-profit corporation, and could therefore could be executed upon. *Id.* At the time, this provision was relatively new, having been enacted in 1927 as a part of the new Corporation Code.

*The Volunteers of America* Court noted that this section is analogous to the Statute of Frauds, and investigated for whose benefit the Statute of Frauds operates, i.e. does the statue inure to the benefit of a third party. The Court followed the Ohio Supreme Court cases of *Minns v. Morse*, 15 Ohio 568 (1846) and *Lefferson v. Dallas*, 20 Ohio St. 68 (1870) and found that a creditor who is not a party

to the transaction cannot invoke the application of the statute of frauds for his own benefit. 31 Ohio N.P. at 324–328.[11] This is still the law in Ohio. *Scott v. Bull*, 80 Ohio Law Abs. 434, 159 N.E.2d 906, 907 (1958) (Only a party to an oral contract can take advantage of the fact that it fails to conform to the requirements of the statute of frauds); *Leibovitz v. Central Nat. Bank* 75 Ohio App. 25, 29, 60 N.E.2d 727 (1944) (Statute of frauds is a mere defense to an action between the parties to an oral contract); *23 Tracts of Land v. United States*, 177 F.2d 967, 970 (6th Cir.1949) ("[T]he plea of the statue of frauds is not available to the Government which was not a party to the contract").

 Further, this Court finds that it is not the intended purpose of § 1702.35 to bar the Attorney General from bringing an action to enforce a charitable trust. The purpose of § 1702.35, as with the statute of frauds, is for the benefit of the parties. Similarly, in the context of a non-profit corporation, it is clear that the purpose of the writing requirement was to prevent those who give, bequeath, donate, or sell property to the non-profit corporation from bringing actions to enforce terms or trusts, or to seek reverters. Allowing the enforcement of such alleged oral trusts would work an extreme hardship for non-profit corporations who frequently seek charitable donations to accomplish their mission. Ohio law has established that rather than allowing numerous donors the ability to enforce such actions (or call for the return of these funds), the Office of the Attorney General will in its discretion pursue these types of actions as it deems appropriate.

Indeed, the Attorney General asserted charitable trusts against non-profit corporations in *Ohio Society for Crippled Children and Adults, Inc. v. McElroy*, 175 Ohio St. 49, 191 N.E.2d 543 (1963), and *Brown v. Holloway*, 1981 WL 2853 (Ohio App.), which were discussed infra. Further, it would be an absurd result if the Attorney General could not bring actions to enforce charitable trusts in the possession of non-profit corporations,

---

**11.** Sixth Circuit Court of Appeals recently followed *Minns and Lefferson in Sadler Machinery*

*Co. v. Ohio Nat., Inc.*, 202 F.2d 887, 891 (6th Cir.1953).

but could bring them in other very similar circumstances such as in *Folino v. Dayton Bar Association,* 1982 WL 3822 (Ohio App.) (cited supra, the Attorney General was a party in a case where a bequeath was made in trust to a bar association to assist young or indigent lawyers in establishing their practices or during financially embarrassing periods of their practice), *Brown v. Jackson,* 1986 WL 1054 (Ohio App.) (cited supra, the Attorney General brought suit and succeeded in imposing a charitable trust against individual defendants who operated a bingo game ostensibly for charitable purposes), *In re Farren,* 27 Ohio App.2d 31, 272 N.E.2d 162 (1970) (Attorney General brought action and succeeded in imposing a charitable trust created in a will against a private hospital for the benefit of indigents), *Brown v. Concerned Citizens for Sickle Cell Anemia,* 56 Ohio St.2d 85, 90, 382 N.E.2d 1155 (1978) (cited supra, the Attorney General brought action and succeeded to impose charitable trust against a group that held themselves out as a non-profit corporation).

The purpose of § 1702.35 was to protect non-profit corporations from suits by donors, or their disinherited heirs. This holding is consistent with the rule that the statute of frauds can only be asserted by the parties. It was not to prevent non-profit corporations from being trustee of charitable trusts. Nor was it to prevent the Attorney General from seeking to enforce the provisions of such trusts.

Further still, this legislative intention is made clear in the opening section of the statute which codifies, but does not limit, the Attorney General's common law right to bring such suits:

> (D) The fact that any person sought to be charged with fiduciary duties is a corporation, association, foundation, or any other type of organization that has, under judicial decisions **or other statutes**, been distinguished from a charitable trust does not provide a presumption against its being a charitable trust as defined in this section.[12]

Ohio Rev.Code § 109.23(D) (emphasis added). This provision alone shows that § 1702.35 does not operate to bar the Attorney General from seeking to impose or enforce charitable trusts against non-profit corporations.

Finally, "It is well established in Ohio that courts of equity may bar application of the statute of frauds." *McCarthy, Lebit, Crystal & Haiman Co. v. First Union Management, Inc.,* 87 Ohio App.3d 613, 623, 622 N.E.2d 1093 (1993). It would clearly be inequitable in this case to allow the creditors of the estate to invade the principal of a fund which was donated with the understanding that the principal would remain as a source of income to further osteopathic medicine in the Toledo area, especially upon the closure of Parkview hospital, which makes this concern all the more real.

To this Court's consternation, the Trustee has also urged this Court to find that there is not ample evidence to support a finding of a charitable trust because of the genuine issue of material fact standard associated with a motion for summary judgment. However, as noted in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), once the movant for summary judgment has met its burden, the opposing party must set forth specific facts showing there is a genuine issue *for trial.* The Trustee has not shown or even alleged evidence which could be brought forth at trial which is not already in the record. This is undoubtedly due to the shortage of living witnesses who can attest to events beginning twenty-five years ago. Thus, the material evidence that can be brought to bear on the issues in this case is documentary and presently available to the Court. The Trustee has not shown such genuine issues of material fact. Nor has the Trustee or Mid–American objected to the general admissibility of any evidence put forth by the Attorney General. Further, if this matter were to be tried, it would be tried to the Court. The issue in this case is not what the evidence is, but what it proves. Summary judgment is an appropriate means for resolving this controversy.

---

**12.** The definition of a charitable trust is defined in § 109.23(A), which incorporates the common law definition by referring to the same as "arising under the laws of this state."

In reaching the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this opinion.

Accordingly, this Court finds:

(1) the bankruptcy estate holds only legal title and not an equitable interest in the funds held in an account known as the "Parkview Development Fund" at Mid–American Bank and Trust Co.;

(2) that these funds are not assets of the bankruptcy estate which can be administered for the benefit of the creditors in the bankruptcy case;

(3) that the bankruptcy estate holds these funds in trust as the trustee of a charitable trust;

(4) that the purpose of the charitable trust is to further osteopathic medicine in the Toledo area (encompassing northwest Ohio and southeast Michigan) for the benefit of the people in that area; and

(5) that by the terms of the trust only the income generated on the principal of this account may be used for this purpose.

Therefore, it is

*ORDERED* that the Motion for Summary Judgment of the Attorney General be, and is hereby, *GRANTED.*

█ It is *FURTHER ORDERED* that as the representative of the bankruptcy estate, the Chapter 11 Trustee has a fiduciary duty to administer the charitable trust in accordance with its terms, or to seek other equitable relief as the law allows.