Brown, Atty. Genl., Appellant, *v.* Concerned Citizens for Sickle Cell Anemia, Inc., et al., Appellees.

(No. 77-1361—Decided November 15, 1978.)

88

Mr. William J. Brown, attorney general, Mr. John W. Clark, III, and Mr. Bruce J. Rakay, for appellant.

Mr. James H. McGee, Messrs. Lucas, Prendergast, Albright, Gibson, Brown & Newman, Mr. Robert E. Albright and Mr. Richard C. Brahm, for appellees.

SWEENEY, J. The central issue before this court is the proper disposition of monies obtained through illegal bingo operations conducted ostensibly for charitable purposes.

Effective November 5, 1975, the voters of Ohio approved a constitutional amendment permitting the General Assembly to authorize and regulate the operation of bingo games conducted by charitable organizations for charitable purposes. Section 6, Article XV of the Ohio Constitution. Pursuant to the above amendment, the General Assembly enacted R. C. 2915.07, effective May 26, 1976, authorizing charitable organizations which obtained a license from the attorney general to conduct bingo games.

Prior to November 5, 1975, bingo games conducted for any purpose were illegal (Section 6, Article XV, Constitution of Ohio, 1851). Prior to January 1, 1974, the operator and participants of the games were subject to possible criminal penalties. However, effective January 1, 1974, bingo games conducted for charitable purposes, although remaining illegal under the Ohio Constitution, were no longer criminal acts. R. C. 2915.02(A)(2); see Committee Comment to R. C. 2915.04. Both before and after January 1, 1974, R. C. 3763.02 and 3763.08 provided a remedy for certain persons to sue for and recover monies expended at the illegal games.

In the instant cause, the trial court held that a charitable trust was created under R. C. 109.23 on February 1,

1975, when Samuel Hearn agreed in writing to donate a certain portion of the proceeds from future bingo operations to the Concerned Citizens for Sickle Cell, Inc.

R. C. 109.23(A) provides as follows:

"'Charitable trust' means any fiduciary relationship with respect to property arising under the law of this state or of another jurisdiction as a result of a manifestation of intention to create it, and subjecting the person by whom the property is held to fiduciary duties to deal with property within this state for any charitable, religious or educational purpose."

This definition is similar to the one found in 2 Restatement of Trusts 2d 210, Section 348, and, as observed in 1 Scott on Trusts (2d Ed.) 37, Section 2.3, it is the generally accepted definition for an express trust.

Whether the General Assembly, in adopting a definition for a charitable trust similar to that found in the Restatement, intended to include under the definition of "charitable trust" only an express trust, need not be decided in this cause, since this court finds it unnecessary to determine whether a charitable trust under R. C. 109.23 was in fact created.

Under R. C. 109.24 it is provided:

"The attorney general shall institute and prosecute a proper action to enforce the performance of any charitable trust, and to restrain the abuse thereof whenever he deems such action advisable * * *."

Effective November 19, 1975, the General Assembly inserted additional language into the provisions of R. C. 109.24 which states:

"The powers of the Attorney General under sections 109.23 to 109.33 of the Revised Code shall be in addition to and not in limitation of his powers held at common law."

One of the recognized powers held by the attorney general at common law was "to inquire into any abuses of charitable donations." 2 Blackstone's Commentaries on the Laws of England (1872), 334. Clearly, the attorney general's traditional power to protect public donations to

charity goes beyond the mere enforcement of express trusts where the formal elements of such a trust—manifestation of intent to create a trust, the existence of trust property, and a fiduciary relationship—are essential to its creation. See, generally, 1 Restatement of Trusts 2d, at pages 6-12, Section 2; and 2 Restatement of Trusts 2d 210, Section 348. The attorney general, in seeking to protect the public interest, may also bring suit to impose a constructive trust on funds collected for charitable purposes but subsequently diverted to other purposes. See Restatement of Restitution 640, 688, at Sections 160 and 169 (Comment c). A constructive trust, although not a formal trust at all, serves as a means to prevent the unjust enrichment of those who would abuse their voluntary roles as public solicitors for charity (see R. C. Chapter 1716). For this court to hold that the attorney general can only enforce express charitable trusts would greatly hamper his ability to carry out his statutory and common law duties.

In the instant cause, the February 1, 1975, written agreement between Hearn and the Concerned Citizens for Sickle Cell, Inc., the newspaper release and advertisements, and the awards presentation, demonstrate that the appellees were representing to the public that monies expended at the bingo games would be donated to charity. Thus, irrespective of whether the Hearns intended to create a trust, they owed a duty to the public to hold monies received from the bingo operation for charitable purposes. The attorney general properly exercised his power to insure that the net proceeds from the games be spent properly, and, therefore, it was proper for the trial court to order that these funds be used exclusively for charitable purposes.*

---

*The statutory remedies for the recovery of monies expended at the bingo games as made available under R. C. 3763.02 and 3763.08 do not preclude this court from imposing a constructive trust on the net proceeds generated from the games. As noted in 1 Restatement of Trusts 2d 160, Section 60, Comment b, monies obtained illegally may yet be the subject of a trust. The fact that the attorney general, pursuant to his own duties, is seeking to impress a trust on these funds has no relation to the provisions set forth in R. C. 3763.02 and 3763.08.

Appellees also assert that the evidence is insufficient to support the trial court's findings concerning the net proceeds generated from the bingo operations, and concerning Samuel and Emmie Mae Hearn's knowledge of the falsity of the entries made in the corporate books.

The evidence reflects that a figure of $37,660 was reported as rental expense on the income statement, although no rent was ever paid. A salary expense of $145,795 was reported, although copies of the employer's W-2 forms for 1975 reflect a total salary expense of $79,425.07. There was testimony of record concerning the nightly receipts and payouts, and numbers in attendance, indicating that the total gross sales figure reflected on appellee's income statement was notably less than what should have been reported.

With respect to Samuel and Emmie Mae Hearn's knowledge of false entries made in the corporate books, there is testimony indicating that Samuel Hearn was the chief operator of the bingo games and that Mrs. Hearn was in charge of the control room where the money and records were kept.

A review of the record convinces this court that there was sufficient evidence to support the trial court's findings, and this court will not, by weighing the evidence, make its own determination with respect to these issues. See *State, ex rel. Puehler,* v. *Bd. of Edn.* (1938), 134 Ohio St. 280, 283.

Accordingly, the judgment of the Court of Appeals is reversed.

*Judgment reversed.*

LEACH, C. J., HERBERT, CELEBREZZE, W. BROWN, HOLMES and STEPHENSON, JJ., concur.

HOLMES, J., of the Tenth Appellate District, sitting for P. BROWN, J.

STEPHENSON, J., of the Fourth Appellate District, sitting for LOCHER, J.