[This decision has been published in *Ohio Official Reports* at 96 Ohio St.3d 118.]

UNIVERSITY HOSPITALS OF CLEVELAND, INC. ET AL., APPELLEES AND CROSS-APPELLANTS; MONTGOMERY, ATTORNEY GENERAL, APPELLEE, *v.* LYNCH ET AL., APPELLANTS AND CROSS-APPELLEES.

[Cite as *Univ. Hosps. of Cleveland, Inc. v. Lynch*, 2002-Ohio-3748.]

*Trusts—Action to adjudicate existence of a constructive trust for which no formal trust instrument exists and to substitute a new trustee is not subject to requirement of R.C. 109.25 that Attorney General be served with process or summons by registered mail—Failure of original parties to serve Attorney General with process or summons in a proceeding does not necessarily render any judgment entered therein void unless the proceeding falls within R.C. 109.25(A) through (D)—Party seeking judicial recognition of either a constructive or a resulting trust bears the burden of producing clear and convincing evidence justifying it.*

(No. 2001-0081—Submitted January 30, 2002—Decided August 7, 2002.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Cuyahoga County, Nos. 77129 and 77134.

_____

SYLLABUS OF THE COURT

1.  An action to adjudicate the existence of a constructive trust for which no formal trust instrument exists and to substitute a new trustee is not subject to the requirement of R.C. 109.25 that the Attorney General be served with process or by summons by registered mail.

2.  The Attorney General has a statutory right to intervene pursuant to R.C. 109.25, in his or her discretion, in any judicial proceeding affecting a charitable trust when the Attorney General determines that the public interest should be protected in such proceeding, but failure of the original parties to serve the

Attorney General with process or summons in a proceeding does not necessarily render any judgment entered therein void, unenforceable, and subject to being set aside upon the Attorney General's motion, unless the proceeding falls within R.C. 109.25(A) through (D).

3. A party seeking the judicial recognition of either a constructive or resulting trust bears the burden of producing clear and convincing evidence justifying it.

_____

**MOYER, C.J.**

{**¶1**} This cause involves entities that are parts of an academic medical center at which medical students and physicians are trained, research is conducted, and patients are provided care. Appellee and cross-appellant University Hospitals of Cleveland, Inc. ("the hospital"), operates in conjunction with the Case Western Reserve University School of Medicine and numerous clinical practice plans to form the Academic Medical Center at Case Western Reserve ("the medical center"). Appellant and cross-appellee University Dermatologists, Inc. ("UDI"), was a medical practice operating in conjunction with the departments of dermatology of both the hospital and the medical school from 1979, the time of UDI's incorporation, until 1998.

{**¶2**} The hospital and the director of its dermatology department, appellee and cross-appellant Kevin D. Cooper, M.D., initiated this action, contending that they are legally entitled to control and manage UDI under various theories, e.g., resulting trust, constructive trust, quantum meruit, and breach of contract. This case also presents the question whether the parties' failure to serve appellee, Attorney General Betty D. Montgomery, with notice of the action rendered the trial court's judgment voidable at the request of the Attorney General pursuant to R.C. 109.25.

I

Factual Background

2

A

The Original Action

{¶3} The term "practice plan" as used herein refers to an entity, sometimes incorporated, that is analogous to a private physician's professional practice. At the medical center, each practice plan corresponds to an academic department of the medical school, e.g., urology, cardiology, etc. The medical school requires that its full-time faculty members treat patients solely through a designated practice plan. Patients, or their insurers, pay the practice plans rather than the individual treating physicians. The practice plans thereby generate significant revenues that are used to cover the expenses of the practice plan, e.g., salaries, rent, equipment, etc. A portion of the net income generated by each practice plan is channeled to the hospital and medical school. The practice plans provide the medical school with comprehensive financial reporting on a regular basis. Moreover, the salaries of physician faculty members are set by the chair of the corresponding medical school department in consultation with the dean of the medical school, although the salaries are paid to the physicians by their practice plan.

{¶4} These practices are consistent with a document created in 1978 by the medical school entitled "Policies Governing Professional Practice Income of Full Time Faculty Members at Case Western Reserve University" ("policies statement"). The policies statement sets forth the responsibilities each department chair and all full-time faculty members have to the dean with respect to the operation of practice plans at the medical school.

{¶5} Historically, it was not uncommon for an individual to simultaneously hold the three positions of chair of a medical school department, director of the corresponding hospital department, and director of the corresponding practice plan. One witness described the relationship of the practice plans, the hospital, and the medical school as "almost symbiotic." As a result, the same person often found it difficult to separate his actions according to these theoretically separate roles.

**{¶6}** In 1977, the medical school appointed David Bickers, M.D., to head its division of dermatology, which at that time was part of the medical school's department of medicine. At Bickers's urging, the division of dermatology was elevated to the status of department, and, in 1979, Bickers was appointed chair of the department of dermatology at the medical school. He thereafter concurrently served as director of the department of dermatology of the hospital.

**{¶7}** In August 1979, after conferring with legal counsel, Bickers formed UDI by incorporating it as a for-profit corporation, pursuant to R.C. Chapters 1785 and 1701. Ohio law requires that the stock of a corporation formed pursuant to R.C. Chapter 1785 be held only by a licensed professional, in the case of UDI, by a medical doctor. R.C. 1785.02, 1785.05, and 1785.07. Bickers obtained a personal bank loan of approximately $35,000 to equip and open UDI's first clinic office.

**{¶8}** When he incorporated UDI, Bickers was aware that practice plans varied from medical center to medical center, as well as within medical centers. He knew of a university where faculty members functioned independently, in individual private practices, and provided only minimal financial support to the university.

**{¶9}** Bickers, in contrast, had a twofold purpose in incorporating UDI: he wanted to create a practice plan that would support the academic mission of the medical school, but he also wanted to "protect [him]self in terms of potential future incursions on the practice organization by the institution," and thereby afford himself "some degree of protection or fall back" should "some unforeseen events occur that would threaten [his] livelihood and [his] ability to practice." In other words, he envisioned a for-profit corporation with himself as the sole shareholder so that he could leave the medical center and take the practice with him if the institution "decided that it wished to diminish or co-opt resources from" the practice plan.

{¶10} In May 1980, in order to implement his plan that UDI would financially benefit the medical school, Bickers submitted a draft agreement to the dean of the medical school, proposing a formula for calculating the portion of UDI income to be given to the medical school. Bickers subsequently met with Richard Behrman, M.D., who was to become dean in July 1980, to discuss the proposal.

{¶11} During the meeting, the two doctors discussed numerous issues concerning UDI's relationship with the hospital and the medical school, including the ownership of UDI should Bickers end his employment with the medical school. Behrman proposed that in such a circumstance, Bickers would transfer the stock of UDI to the dean of the medical school, for ultimate transfer to Bickers's successor to the chair of the department of dermatology. Behrman testified that Bickers never rejected this proposal, nor indicated that he would not transfer UDI stock to the medical school should he decide to leave. In fact, Behrman believed that Bickers orally agreed to this proposal at that meeting. On the other hand, Bickers recalled that he had specifically rejected the dean's suggestion that the UDI shares should be transferred to the dean if Bickers left the medical school.

{¶12} After the meeting, Bickers and Behrman each prepared a draft agreement to govern that contingency, each with a different resolution of the issue. However, no written agreement was ever executed. Nevertheless, UDI began submitting payments to the medical school in accordance with the formula set forth in the original draft agreement submitted by Bickers in May 1980. UDI also began providing annual financial reports to the medical school. Over the years the hospital provided support to UDI, including supplying it with equipment, clinic space, loans, etc.

{¶13} In 1981, Bickers recruited appellant and cross-appellee William S. Lynch, M.D., to the medical school to develop the surgical practice within the dermatology department of the medical school. Bickers described the addition of Lynch as "clearly the single and most important addition to [the UDI] staff at that

time in terms of building our practice revenues." He described Lynch as "well established in the community," with a "stellar reputation" for surgical skills, an "enthusiasm for teaching," and an "ability to combine outstanding clinical skills with a commitment to the mission of an academic department."

{¶14} In December 1993, Bickers left the medical center to join the dermatology department at Columbia University, and Lynch became acting chair of the department of dermatology of the medical school and acting director of the department of dermatology of the hospital. Not being interested in retaining those positions, Lynch served on a recruiting committee to find a permanent replacement for Bickers.

{¶15} On April 5, 1994, Lynch purchased all outstanding shares of UDI stock from Bickers for $1,000. Bickers testified that he had transferred the UDI stock to Lynch for this nominal amount because he considered Lynch to be a cofounder. Bickers believed that UDI's success and accomplishments were due to Lynch's efforts as much as his own and deemed a $1,000 purchase price to be fair. At trial, Bickers expressly rejected the suggestion that he had transferred the UDI stock to Lynch in trust until it could ultimately be transferred to a permanent director and chair at the medical center.

{¶16} During Bickers's tenure as department chair, and by the agreement of both doctors, Lynch had taken primary responsibility for administering UDI as a practice plan, while Bickers had focused primarily on academic responsibilities and research. Lynch purchased the UDI stock with the understanding that he was assuming all of UDI's assets and liabilities and that he would manage the practice with a division of responsibility between himself and the new chair similar to that he had shared with Bickers.

{¶17} In November 1994, appellee and cross-appellant Kevin D. Cooper, M.D., accepted a permanent appointment to the positions of director of the department of dermatology of the hospital and chair of the department of

dermatology of the medical school. During his recruitment, Cooper had received general information as to the structure and operation of practice plans at the medical center but did not receive specific information concerning the ownership of UDI. He was not aware that Lynch owned all outstanding UDI stock and asserted full rights of ownership, including the right to direct the practice plan. Rather, Cooper assumed that "the chair controlled the practice." In fact, he believed that it was critical to the success of the medical school and the hospital that this be the case. Thus, he expected to control UDI upon becoming chair and director of the departments of dermatology of the medical school and the hospital.

{¶18} In the spring of 1995, Cooper first became aware that the stock of UDI had been transferred from Bickers to Lynch and that Lynch intended to exercise full rights of ownership even after Cooper's formal appointments to director and chair on July 1, 1995. Lynch made it clear to Cooper that he did not intend to relinquish control of UDI. Despite Cooper's immediate sense of apprehension, he went forward with his plans to accept the appointments at the medical school and the hospital, believing that the dispute could be resolved in an equitable way. However, extensive negotiations between Lynch and Cooper failed to resolve the controversy.

{¶19} Ultimately, Cooper incorporated a new legal entity, University Hospitals Dermatology Associates, Inc., which became the medical center's dermatology practice plan in July 1998, and UDI's relationships with the hospital and the medical school were terminated. Thereafter, UDI and the newly created practice plan became competitors for dermatologists, administrative employees, and patients.

{¶20} This action was initiated in July 1998, when the hospital and Cooper filed a complaint naming Lynch and UDI as defendants. The medical school has never been a party to the litigation.

{¶21} The complaint asserted multiple legal claims sounding in both contract and tort. In addition to seeking legal relief in the form of damages, the hospital and Cooper sought equitable relief in the form of specific performance of contract or imposition of a constructive or resulting trust. It alleged that UDI had been created in trust for the benefit of the hospital and that Lynch held legal ownership of the shares of UDI in a fiduciary capacity as a trustee. It further demanded that Lynch be required to transfer his interest in UDI to Cooper, the current director of the hospital's department of dermatology. In the alternative, it asserted a quantum meruit theory, claiming that Lynch and UDI had been unjustly enriched, and requested that they be ordered to disgorge their gains.

{¶22} Lynch and UDI answered and asserted numerous counterclaims against the hospital and Cooper, as well as claims against the medical school's new practice plan, University Hospitals Dermatology Associates, Inc., which they named a third-party defendant. The trial court decided to try the legal claims of the hospital and Cooper separately from their equitable claims.

{¶23} After two weeks of trial to the bench, the court issued findings of fact and conclusions of law favoring Lynch and UDI. It found that UDI had been incorporated for profit, funded by its founder, Bickers, and had operated in conjunction with, but was not owned by, the hospital. Although recognizing that a "mutually beneficial working relationship" had developed between these entities, the court declared UDI to be a legal entity separate from the hospital and the medical school. The trial court further found that the relationship between UDI and the hospital had been severed and that the hospital had evicted Lynch and UDI. The trial court noted that Lynch's removal from the faculty of the medical school was expected soon.

{¶24} Accordingly, the trial court held that the hospital and Cooper had not satisfied their burden of proving that it would be unconscionable for Lynch to retain ownership of UDI or that the hospital was otherwise entitled to control UDI. To

8

the contrary, the trial court expressly found that to rule in favor of the hospital and Cooper on their equitable claims would result in unjust enrichment of the hospital. The court concluded that Lynch and Bickers had developed UDI and contributed to its success through years of diligence and hard work and that all parties to the dispute had mutually benefited from UDI's success.

{¶25} In addition, the court ruled that a contract had never been formed between UDI and the medical school because there had been no meeting of the minds between Bickers and Behrman as to the disposition of UDI if Bickers decided to leave the medical school. This finding foreclosed the hospital's contention that the hospital had a right to equitable specific performance pursuant to a third-party-beneficiary theory or otherwise.

{¶26} Thereafter, the Eighth District Court of Appeals dismissed an appeal filed by the hospital and Cooper for lack of a final appealable order because the legal claims remained pending. The parties then filed cross-motions seeking summary judgment on the remaining legal claims.

B

Appearance of the Attorney General

{¶27} While these summary judgment motions were pending, and over two months after the trial court had rendered its decision on the equitable claims, the Attorney General of the state of Ohio, Betty D. Montgomery, appeared in the case for the first time, moving for leave to intervene and requesting the trial court to void its findings of fact and conclusions of law. The Attorney General argued that she had a statutory right to intervene pursuant to R.C. 109.25, in that the object of the case was "to terminate a charitable trust, distribute the assets thereof, or construe the provisions of an instrument with respect to a charitable trust." She claimed that she was a necessary party pursuant to statute, yet had not been served with process or summons, and that any judgment that the trial court might thereafter enter would be void and unenforceable. She characterized herself as representing "the

charitable beneficiaries served by [the hospital, the medical school], and several other charitable trusts and organizations."

**{¶28}** The court heard oral argument on the cross-motions for summary judgment and on the Attorney General's motion to intervene. It thereafter ruled in favor of UDI and Lynch on their motion for summary judgment on all remaining claims against them. In the same entry, the trial court overruled the Attorney General's motion to intervene.

**{¶29}** The hospital and Cooper filed a notice of appeal, as did the Attorney General, and the court of appeals consolidated the two appeals. In a split decision, the court of appeals accepted the Attorney General's argument that the judgment of the trial court should be voided because she had not been served. It remanded the cause for new proceedings in which the Attorney General could participate. The court deemed all remaining assignments of error to be moot.

**{¶30}** This cause is now before this court upon the allowance of a discretionary appeal and cross-appeal.

II

The Right of the Attorney General to Intervene

**{¶31}** UDI asserts that the court of appeals erred in reversing the trial court's denial of the Attorney General's motion to intervene and in declaring void the judgment of the trial court in UDI's favor.

**{¶32}** In rebuttal, the Attorney General and the hospital rely on R.C. 109.25, which provides:

**{¶33}** "The attorney general is a necessary party to and shall be served with process or with summons by registered mail in all judicial proceedings, the object of which is to:

**{¶34}** "(A) Terminate a charitable trust or distribute assets;

**{¶35}** "(B) Depart from the objects or purposes of a charitable trust as the same are set forth in the instrument creating the trust * * *;

{¶36} "(C) Construe the provisions of an instrument with respect to a charitable trust;

{¶37} "(D) Determine the validity of a will having provisions for a charitable trust.

{¶38} "A judgment rendered in such proceedings without service of process or summons upon the attorney general is void, unenforceable, and shall be set aside upon the attorney general's motion seeking such relief. The attorney general shall intervene in any judicial proceeding affecting a charitable trust when requested to do so by the court having jurisdiction of the proceeding, and may intervene in any judicial proceeding affecting a charitable trust when he determines that the public interest should be protected in such proceeding."

{¶39} This case was not brought for any of the purposes identified in R.C. 109.25(B) through (D). Subsections (B) and (C) are not relevant, as each refers to the "instrument" creating or governing the charitable trust at issue. Here no instrument was executed creating a charitable trust in which UDI or its assets constituted the trust res. Similarly, Subsection (D), governing testamentary charitable trusts, is inapplicable.

{¶40} The Attorney General argues, however, that she should be deemed a necessary party based on R.C. 109.25(A). We are not persuaded by her argument. The object of the action in which she sought to intervene was not one to terminate a charitable trust or distribute assets; it was one to adjudicate the existence of a trust. The hospital in its complaint sought judicial recognition that the shares of UDI constituted the trust res of a resulting or constructive trust, claiming that Lynch's legal ownership of UDI was unconscionable and abhorrent to equity. It did not contend that UDI should be considered a charitable trust subject to R.C. 109.25, nor did it seek to terminate or distribute the assets of UDI. Rather, the hospital sought to have Lynch's ownership of UDI stock declared to be ownership as a trustee only and further sought the substitution of a new trustee for Lynch.

**{¶41}** Similarly, the Attorney General sought as relief in her proffered complaint an order for "the appointment of a new trustee over the charitable assets currently held by University Dermatologists, Inc." and for "the transfer of the common stock of University Dermatologists, Inc. to the new trustee appointed over University Dermatologists, Inc." It is logically inconsistent to argue that the hospital's suit against Lynch was to terminate a trust, as contemplated by R.C. 109.25(A), and to simultaneously argue that a new trustee of that trust should be appointed.

**{¶42}** Because none of the circumstances contemplated by R.C. 109.25(A) through (D) is present, the Attorney General's argument that the trial court's judgment must be declared void for failure to serve her as a necessary party pursuant to these subsections lacks merit.

**{¶43}** The last sentence of R.C. 109.25, however, provides that the Attorney General "may intervene in any judicial proceeding affecting a charitable trust when he [or she] determines that the public interest should be protected in such proceeding." This statutory language clearly gives the Attorney General the right to intervene in judicial proceedings "affecting a charitable trust" when the public interest requires protection. This language, however, is not equivalent to the language immediately preceding it, which declares void any judgment rendered in proceedings described in R.C. 109.25(A) through (D) in the absence of service upon the Attorney General.

**{¶44}** We do not here decide the merits of the Attorney General's contention that UDI is the res of a charitable trust or of a constructive charitable trust. We do assume, without deciding, that the Attorney General's allegation that a given legal entity constitutes a charitable trust is sufficient to trigger application of the last sentence of R.C. 109.25 and supports her statutory right to intervene. See *Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.* (1978), 56 Ohio St.2d 85, 90, 10 O.O.3d 220, 382 N.E.2d 1155. However, only those judgments

12

involving circumstances falling within subsections (A) through (D) of R.C. 109.25 are void based upon failure of service upon the Attorney General. Because the underlying action filed by the hospital did not constitute judicial proceedings within the scope of those subsections, the trial court's judgment herein is not void pursuant to R.C. 109.25.

{¶45} We hold that an action to adjudicate the existence of a constructive trust for which no formal trust instrument exists and to substitute a new trustee is not subject to the requirement of R.C. 109.25 that the Attorney General be served with process or by summons by registered mail. In addition, we hold that the Attorney General has a statutory right to intervene pursuant to R.C. 109.25, in her discretion, in any judicial proceeding affecting a charitable trust when she determines that the public interest should be protected in such proceeding, but that failure of the original parties to serve the Attorney General with process or summons in a proceeding does not necessarily render any judgment entered therein void, unenforceable, and subject to being set aside upon the Attorney General's motion, unless the proceeding falls within R.C. 109.25(A) through (D).

{¶46} The Attorney General's right to intervene pursuant to the last sentence of R.C. 109.25 is subject to the general rules governing intervention in civil actions, specifically, Civ.R. 24. In this case, the Attorney General's right to intervene did not fall within the scope of R.C. 109.25(A) through (D) but rather was based either on the last sentence of R.C. 109.25 or on the common law. Under either theory, her motion to intervene was subject to the general procedural rules governing intervention.

{¶47} Both Civ.R. 24(A)(1), providing for intervention as of right in an action when a statute of this state confers an unconditional right to intervene, and Civ.R. 24(B), providing for permissive intervention generally, require a party seeking intervention to make "timely application." The timeliness of a motion to intervene pursuant to Civ.R. 24(A) is a matter within the sound discretion of the

trial judge, and the trial court's decision will be reversed only upon a showing of an abuse of that discretion. *State ex rel. First New Shiloh Baptist Church v. Meagher* (1998), 82 Ohio St.3d 501, 503, 696 N.E.2d 1058.

{¶48} In determining the timeliness of a motion to intervene pursuant to Civ.R. 24, a court should consider the following factors: (1) the point to which the suit has progressed, (2) the purpose for which intervention is sought, (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case, (4) the prejudice to the original parties due to the proposed intervenor's failure after he or she knew or reasonably should have known of his or her interest in the case to apply promptly for intervention, and (5) the existence of unusual circumstances militating against or in favor of intervention. Id., 82 Ohio St.3d at 503, 696 N.E.2d 1058.

{¶49} It is significant that the Attorney General's motion was filed well after the completion of two weeks of trial, and more than two months after the trial court had issued findings of fact, conclusions of law, and an opinion rejecting the assertion that a trust existed. While UDI does not deny that the Attorney General acted promptly in filing her motion upon first learning of the underlying suit, other factors support the trial court's denial of the motion. The record clearly demonstrates that the original parties had fully litigated the relevant facts. The trial court had made findings of fact that did not support the contention that a trust should be imposed.

{¶50} Moreover, the responsibility for serving the Attorney General, assuming that a responsibility existed, rested primarily with the hospital, as the only party that characterized the action as one involving a charitable trust. Here the hospital and Cooper seek to benefit from their own failure to give the Attorney General timely notice of the suit. The hospital and Cooper did not proffer the theory that their action in any way affected a charitable trust as governed by R.C. Chapter 109, and apparently first contacted the Attorney General to notify her of the action

only upon having received an unfavorable decision from the trial court on the theories they chose to pursue.

{¶51} The trial court did not abuse its discretion in denying intervention in this case, and the court of appeals erred in holding the judgment of the trial court to be void pursuant to R.C. 109.25. The court of appeals should not have reversed and remanded the cause to the trial court for new proceedings.

III

Cross-Appeal of the Hospital and Cooper

{¶52} Having determined that the trial court's judgment was void pursuant to R.C. 109.25, the court of appeals deemed all other assignments of error to be moot, based on its decision that the trial court's judgment was void pursuant to R.C. 109.25. We, however, have the authority to review those assignments of error de novo. *Apel v. Katz* (1998), 83 Ohio St.3d 11, 18, 697 N.E.2d 600. We have chosen to do so.

A

Alleged Error in Denying Equitable Relief

{¶53} In its cross-appeal, the hospital and Cooper argue that the trial court erred in denying equitable relief in the form of declaring a resulting or constructive resulting trust. We disagree.

{¶54} The trial court refused to impose a constructive or resulting trust on the stock of UDI, finding that equity did not demand it. It concluded that Lynch was legally entitled to full ownership rights in UDI and that his retention of that ownership was neither shocking to the conscience nor inequitable. We find more than sufficient evidence in the record to support the trial court's factual findings and find no error in its conclusions of law.

{¶55} A party seeking the judicial recognition of either a constructive or resulting trust bears the burden of producing clear and convincing evidence justifying it. Professor Bogert observes that precedent exists that " '[i]f the

evidence is doubtful or capable of reasonable explanation upon a theory other than the existence of the trust, it is not sufficient to support a decree declaring and enforcing the trust,' " explaining that "[t]hese statements reflect judicial caution in accepting oral evidence which is intended to contradict absolute conveyances." 10 Bogert, Trusts and Trustees (2d Ed. Rev.1978) 44-49, Section 472, quoting *Catherwood v. Morris* (1931), 345 Ill. 617, 636, 178 N.E. 487, 494.

1

Resulting Trust

**{¶56}** We have defined a resulting trust as one that the court of equity declares to exist where the legal estate in property is transferred or acquired by one under circumstances indicating that the beneficial interest is not intended to be enjoyed by the holder of the legal title. *First Natl. Bank of Cincinnati v. Tenney* (1956), 165 Ohio St. 513, 515, 60 O.O. 481, 138 N.E.2d 15. See, also, Comment *b* to Section 160 of the Restatement of the Law, Restitution (1937) 642. Generally, resulting trusts have been recognized in three situations, none of which is present in the case at bar: (1) purchase-money trusts, (2) instances where an express trust does not exhaust the res given to the trustee, and (3) where express trusts fail, in whole or in part. Id., 165 Ohio St. at 515-516, 60 O.O. 481, 138 N.E.2d 15.

**{¶57}** The trial court found that Bickers had transferred the stock of UDI to Lynch. Because there was no finding of any intent to transfer anything less, the sine qua non of a resulting trust is absent. Therefore the trial court did not abuse its discretion in refusing to recognize a resulting trust.

2

Constructive Trust

**{¶58}** We have adopted the following definition of a constructive trust:

**{¶59}** " '[A] trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct,

16

artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.' " *Ferguson v. Owens* (1984), 9 Ohio St.3d 223, 225, 9 OBR 565, 459 N.E.2d 1293, quoting 76 American Jurisprudence 2d (1975) 446, Trusts, Section 221.

{¶60} The imposition of a constructive trust is usually associated with the acquisition of property by fraud. *Aetna Life Ins. Co. v. Hussey* (1992), 63 Ohio St.3d 640, 642, 590 N.E.2d 724. Unjust enrichment of a person occurs when he or she "has and retains money or benefits which in justice and equity belong to another." *Hummel v. Hummel* (1938), 133 Ohio St. 520, 528, 11 O.O. 221, 14 N.E.2d 923. A constructive trust is imposed "not because of the intention of the parties but because the person holding the title to property would profit by a wrong, or would be unjustly enriched if he were permitted to keep the property." Restatement of the Law, Restitution, Section 160, Comment *b*.

{¶61} It was therefore the burden of the hospital and Cooper to support imposition of a constructive trust by clear and convincing evidence that Lynch, who holds legal title to the shares of UDI, would profit by his own wrongdoing or be unjustly enriched by retaining ownership and control of UDI, in that control of UDI rightfully belonged to the hospital. The trial court rejected the proposition that the stock of UDI belongs in justice and equity to the hospital, and the record supports that holding.

{¶62} At best, the hospital and Cooper have demonstrated that they *believed* that UDI stock would, or should, be transferred to Bickers's successor should he no longer serve in the position of hospital department director or medical school chair. It is axiomatic that the formation of a contract is dependent upon both offer and acceptance and that silence in response to an offer does not generally indicate assent. 1 Corbin on Contracts (Rev.Ed.1993), Sections 3.18 and 3.28. The record

supports the trial court's factual finding that Bickers never assented to Behrman's proposal regarding disposition of UDI stock. That being the case, Bickers was not contractually precluded from transferring UDI stock to someone other than the hospital's department director.

{¶63} Clearly, the hospital and Cooper believe that it would be equitable for the hospital to control UDI. However, the facts as found by the trial court, and amply supported by the record, do not demonstrate that such a result is justified in equity. The doctrine of constructive trust does not allow a court to disregard existing legal rights merely to fashion a result that it deems fairer than that created by the parties.

{¶64} The hospital and Cooper contend that the 1978 practice policies statement adopted at the medical center is evidence of an implied contract that UDI stock would be transferred if necessary to ensure that the stock of the dermatology practice plan was held by a department director of the hospital. We find nothing to that effect in the statement. That document governs disposition of the practice income of full-time faculty, financial reporting of practice plan income to the hospital, and the determination of faculty salaries. It does not address ownership of the practice plans, although it recognizes that practice plans might be organized as partnerships, corporations, or other associations. Nor does the fact that UDI operated in accordance with those policies for many years, or in accordance with other requests of Dr. Behrman, mean that continuation of that course of conduct by UDI was contractually required.

{¶65} Bickers incorporated UDI and was the legal owner of all its stock. Inherent in that ownership was the right to dispose of that stock on terms that Bickers alone deemed acceptable. He transferred his interest to Lynch. We find nothing unjust in Lynch thereupon asserting the rights of ownership that he legally possessed.

{¶66} Lynch, in purchasing UDI's stock, obtained the right to control UDI. In the absence of proof of an equitable obligation to the contrary, the hospital had no right to interfere with Lynch's exercise of control over the corporation he owned. If either party became dissatisfied with the other, it had the legal right to terminate the relationship. In fact, upon determining that control of its dermatology practice plan was critical to its mission, the hospital had the option of terminating its recognition of UDI as its dermatology practice plan. That is exactly the course the hospital followed.

{¶67} The trial court did not err in refusing to grant equitable relief to the hospital in the form of a constructive or resulting trust.

B

Alleged Error in Granting Summary Judgment Motion on Legal Claims

{¶68} In the second proposition of law of their cross-appeal, the hospital and Cooper challenge the trial court's entry of summary judgment for UDI and Lynch on the hospital's legal claims, e.g., breach of contract and tortious interference with contractual relations.

{¶69} Summary judgment is appropriate where the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

{¶70} We have reviewed the record and find it sufficient for us to conclude that the trial court did not err in entering summary judgment in favor of UDI and Lynch on the legal claims asserted in the complaint.

C

Alleged Error in Denying Leave to Amend Complaint

{¶71} In the third proposition of law of their cross-appeal, the hospital and Cooper assert that the trial court abused its discretion in denying their motion for leave to amend their complaint filed nearly a full year after the initial complaint had been filed, and after the trial court had issued its findings of fact and

conclusions of law. The motion requested leave to add five additional causes of action for damages based on various tort theories.

**{¶72}** The trial court did not abuse its discretion in denying this untimely motion.

**{¶73}** The judgment of the court of appeals is reversed, and the cause is remanded with instructions to reinstate the judgment of the trial court.

Judgment reversed

and cause remanded.

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in part and dissents in part.

————————————

**Cook, J., concurring in part and dissenting in part.**

**{¶74}** R.C. 109.25(A) through (D) list the types of judicial proceedings to which the Attorney General is a necessary party. Because this case does not fit any of these descriptions, the failure to serve the Attorney General did not render void the trial court's judgment. I therefore agree with the majority's decision to reverse the judgment of the court of appeals.

**{¶75}** Unlike the majority, however, I would not reach the matters addressed in Part III of its opinion. The court of appeals declared these issues to be moot in light of its holding that the trial court's judgment was void. Having found this determination to be erroneous, we should remand this cause and allow the court of appeals to address, in the first instance, the parties' remaining contentions on appeal.

————————————

Jones, Day, Reavis & Pogue, George J. Moscarino and Stephen J. Squeri, for appellees and cross-appellants.

Betty D. Montgomery, Attorney General, and David J. Espinoza, Assistant Attorney General, for appellee Attorney General Betty D. Montgomery.

Reminger & Reminger, Mario C. Ciano and T. Leigh Anenson; Gallagher, Sharp, Fulton & Norman and John E. Martindale, for appellants and cross-appellees.

_____